BOTTOMLY, Attorney General, Plaintiff, v. FORD, Governor, et al, Defendants

No. 8596

Submitted March 23, 1945. Decided March 30, 1945.

157 Pac. (2d) 108

Mr. R. V. Bottomly, Attorney General and Mr. Clarence Hanley, Assistant Attorney General, both of Helena, for plaintiff.

Mr. H. C. Hall of Great Falls for defendant Loble.

Mr. Lester H. Loble of Helena in pro. per.

Messrs. Rankin and Acher of Helena for defendant Jones.

The Hon. Sam C. Ford, Governor, and Mr. E. G. Toomey, both of Helena, amici curiae.

Opinion: PER CURIAM.

This proceeding seeks a declaratory judgment determining that sections 631 to 670, Revised Codes (the direct primary laws) are applicable to nominations of candidates for a special election to fill a vacancy in the office of Representative in the Congress of the United States.

The facts are that in the general election in Montana in November 1944 James F. O'Connor was elected Representative in Congress in the Second Congressional District for the term commencing on January 3, 1945, and ending on January 3, 1947. After qualifying and taking the office, he died. There is now a vacancy in the office.

Governor Sam C. Ford, who takes the position that because of statutes and prior decisions of this court, the primary law has no application to special elections to fill vacancies, issued a writ of election on March 7, 1945, designating Tuesday, the fifth day of June, 1945, as the day for holding a special election in the several counties comprising the Second Congressional District, at which the electors of that district shall elect a representative in Congress to fill the vacancy.

The question before us is: Shall candidates of the respective political parties be chosen in a special primary election? In considering this point our province is but to determine the legislative intent on the subject. In other words, we must declare what appears to be the legislative intent as gathered

from legislative Acts and not what we might prefer were we sitting as members of the Legislature.

The direct primary law was enacted by the people in 1912 as an initiative measure. We point out that notwithstanding the direct primary law, vacancies in most public offices are filled without any election at all but by the power of appointment. In the case of a vacancy in the United States Senate the Seventeenth Amendment to the United States Constitution provides in part: ''When vacancies happen in the representation of any state in the Senate, the executive authority of such state shall issue writs of election to fill such vacancies: Provided, that the legislature of any state may empower the executive thereof to make temporary appointment until the people fill the vacancies by election as the legislature may direct.''

Pursuant to this constitutional amendment, and after the adoption of our primary law, what is now section 825, Revised Codes, was enacted, reading: ''When a vacancy happens in the office of one or more senators from the state of Montana in the Congress of the United States, the governor of this state shall issue, under the seal of the state, a writ or writs of election, to be held at the next succeeding general state election, to fill such vacancy or vacancies by vote of the electors of the state: provided, however, that the governor shall have power to make temporary appointments to fill such vacancy or vacancies until the electors shall have filled them.'' Hence, as to vacancies in the office of United States Senator, there is no such thing as selecting nominees at a special primary election.

During the oral argument it was conceded that Montana has no express legislative authorization for the holding of a special primary election, but it was contended that neither has it any such authority for the holding of a special election to fill vacancies and that therefore both authorizations must be sought in federal authority. It is not true that Montana has no statutory authority for holding a special election to fill vacancies. Section 532, Revised Codes, provides: ''Special elections are such as are held to supply vacancies in any office, and are held

at such times as may be designated by the proper officer or authority."

. Upon adoption of that statute in 1895 the United States Constitution provided, and still provides, (Article 1, section 2): "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." Section 532 therefore authorizes the special election in question and the fixing of the time thereof by the Governor. But no such authority can be found for a special primary election to name the candidates. It is argued that since the United States Constitution provides that the executive shall issue writs of election, it contemplates two writs, one for a special primary election, and the other for the special election. Since, when the Constitution was drafted and adopted primaries were unheard of, the argument is unsound. Furthermore, if the provision were that "When a vacancy happens * * * the executive * * * shall issue writs of election to fill such vacancy," the argument might have force; but having started with the plural,—vacancies, it could not possibly have followed with the singular,—a writ of election; the failure to use the singular cannot, therefore, be interpreted as an authorization of writs of election for the filling of a single vacancy. Moreover the statute concludes with the statement that the writs of election are for the filling of vacancies and not of a vacancy.

Section 632 is the section providing for the holding of primary elections and fixing the time of holding such elections. As originally enacted it provided: "On the seventieth day preceding any general election (not including special elections to fill vacancies, municipal elections in towns and cities, irrigation district and school elections) at which public officers in this state and in any district or county are to be elected a primary nominating election shall be held in accordance with this law in the several election precincts comprised within the territory for which such officers are to be elected at the ensuing election, which shall be known as the primary nom-

inating election, for the purpose of choosing candidates by the political parties, subject to the provisions of this law, for senator in congress, and all other elective state, district and county officers, and delegates to any constitutional convention or conventions that may hereafter be called, who are to be chosen at the ensuing election wholly by electors within this state, or any subdivision of this state, and also for choosing and electing county central committeemen by the several parties subject to the provisions of this law." (Rev. Codes 1921, sec. 632.) It was later amended and now fixes the date as of the third Tuesday in July preceding any general election.

Plaintiff contends, however, that because of section 639 the party nominees for this vacancy must be chosen at a special primary election. Section 639 in part provides: "Every political party which has cast three per centum (3%) or more of the total vote cast for Representative in Congress at the next preceding general election in the county, district or state for which nominations are proposed to be made, shall nominate its candidates for public office in such county, district or state, under the provisions of this law, and not in any other manner; and it shall not be allowed to nominate any candidate in the manner provided by section 612 of this code."

Plaintiff further relies upon that part of section 631 reading: "Whenever the provisions of this law in operation prove to be of doubtful or uncertain meaning, or not sufficiently explicit in directions and details, the general laws of Montana, and especially the election and registration laws, and the customs, practice, usage, and forms thereunder, in the same circumstances or under like conditions, shall be followed in the construction and operation of this law, to the end that the protection of the spirit and intention of said laws shall be extended so far as possible to all primary elections, and especially to all primary nominating elections provided for by this law." But the effect of that section is to apply the general election laws to primary elections, and not to supersede those general laws.

In State ex rel. Reibold v. Duncan, 55 Mont. 380, 177 Pac.

250, the precise question before us was decided by this court. In that case the court stated the question before it as follows:

■ "There is involved the single question: Did the adoption of the General Primary Law (Laws 1913, p. 570) operate to repeal in their entirety all prior existing laws which governed the nomination of candidates for public office?" In holding that all prior laws were not repealed by the primary law and that the primary laws are limited to the nomination of candidates to be voted for at general elections and are not applicable to nominations of candidates to be voted for at special elections, the court, speaking through Mr. Justice Holloway, said:

"But no provision is made for a primary election to nominate candidates to be voted upon at special elections; on the contrary, the terms of the Act are made applicable to nominations to be voted on at general elections only. Section 2 [which with the amendment above noted is now section 632] declares: 'On the seventieth (70) day preceding any general election (not including special elections to fill vacancies, municipal elections in towns and cities, irrigation district and school elections) at which public officers in this state and in any district or county are to be elected, a primary nominating election shall be held in accordance with this law,' etc.

"Since the primary election under public control is the very essence of the Act, it must follow that, in failing to make provision for such election to nominate candidates to be voted upon at special elections, the lawmakers intended that the Act in its entirety should be construed as limited in its operations to the nominations of candidates to be voted for at general elections, and that every section should be read with this construction in mind. * * *

"We do not agree with counsel that the primary election law was designed to furnish the exclusive means by which all candidates for public office shall be nominated, and that the failure of that Act to provide for nominations of candidates to be voted for at special elections was a mere oversight. The

references in sections 2 and 7 [8 now Sec. 639] indicate clearly that the subject was not overlooked, but for some sufficient reason it was evidently considered that the provisions of the direct primary law are inapplicable to the nomination of candidates to be voted for at special elections, and that subject was reserved for control by existing laws or future legislation. No subsequent enactments dealing with the matter have been passed, and the authority to make such nominations must be sought in prior statutes.''

This court in the Duncan case concluded by holding that ██ what are now sections 612 and 615 were the statutes applicable to nominations of candidates to be voted upon at a special election to fill a vacancy. It is contended that this decision was merely dictum and not a binding precedent. That which is within the issue, fully argued by counsel and deliberately considered by the court in its opinion, is not dictum. (Helena Power Transmission Co. v. Spratt, 37 Mont. 60, 94 Pac. 631; Montana Horse Products Co. v. Great Northern Ry. Co., 91 Mont. 194, 7 Pac. (2d) 919; First Nat. Bank of Kalispell v. Perrine, 97 Mont. 262, 33 Pac. (2d) 997.) Nor does the decision lose its value as a precedent because the case might have been decided on some other ground. (21 C. J. S., Courts, sec. 190, p. 314 et seq.; 14 Am. Jur., Courts. sec. 83. pp. 297, 298.) It was not regarded by the court as dictum for in the later case of State ex rel. Mills v. Stewart, 64 Mont. 453, 210 Pac. 465, 470, the court said: ''The court has held in the case of State ex rel. Reibold v. Duncan, supra, that the initiative law has no application to special elections, and that it was not designed to furnish the exclusive means by which all candidates for public office shall be nominated.'' Likewise it is contended that the Duncan case was wrong and we are now asked to overrule it. That case has now stood for twenty-seven years. Many sessions of the legislative assembly have been held since the decision was rendered. The legislature has seen fit to make no change in the law on this subject until in 1945 which change we will hereafter allude to further. Generally, of course. legislative

168

intent is indicated by its action rather than by its failure to act. "On the other hand, it has been declared that the silence of the legislature, when it has authority to speak, may sometimes give rise to an implication as to the legislative purpose, the nature and extent of that implication depending on the nature of the legislative power and the effect of its exercise. The fact that the Legislature has not seen fit by amendment to express disapproval of a contemporaneous or judicial interpretation of a particular statute, has been referred to as bolstering such construction of the statute, or as persuasive evidence of the adoption of the judicial construction. In this respect, it has been declared that where a judicial construction has been placed upon the language of a statute for a long period of time, so that there has been abundant opportunity for the lawmaking power to give further expression to its will, the failure to do so amounts to legislative approval and ratification of the construction placed upon the statute by the courts, and that such construction should generally be adhered to, leaving it to the legislature to amend the law should a change be deemed necessary. These rules are particularly applicable where an amendment is presented to the legislature and fails of enactment, or where the statute is amended in other particulars." (50 Am. Jur., Statutes, sec. 326, pp. 318, 319. To the same effect see 59 C. J. 1037, notes 44 - 48.)

Those who argue that the Reibold decision is dictum except upon the point that the direct primary law did not repeal section 615 relating to independent candidates, seem to approve the holding upon that point. Yet they seem also to consider that the direct primary law is controlled by the statement, submitted in advocacy of the measure, that "the purpose of the direct primary law is to place the nominations of all candidates for public office directly in the hands of the voters." If they really believe that the statement governs, rather than the words of the statute itself, they should be consistent; for that statement would abolish section 615 as fully as section 612. The fact is that the statute abolishes neither, as the court directly

held in the Reibold case, and the statement cannot control the statute.

Were we convinced that the Duncan decision was and is erroneous, a declaration to that effect would not be helpful now because of the action of the legislative assembly of 1945. That assembly was asked in effect to change the rule of the Duncan case by Senate Bill 67 and House Bill 168 by making provision for a special primary election to select nominees for the office of Representative in Congress, to care for the very matter which we are asked to provide for. The Legislature declined to do so, and defeated both measures. Not only did it decline to change the rule stated in the Duncan case, and affirmed four years later in the Mills case, but by adopting Senate Bill 11 it amended section 612, Revised Codes of 1935, to read as follows: ''Convention or primary meeting defined. Vacancies. Any Convention or primary meeting held for the purpose of making nominations for public office, or the number of electors required in this Chapter, may nominate candidates for public office to be filled by election in the State. A convention or primary meeting within the meaning of this Chapter is an organized assemblage of electors or delegates representing a political party or principle, *and in the event a vacancy shall happen by death or resignation in the representation from any Congressional District of the State of Montana in the House of Representatives of the Congress of the United States, only the electors residing within such Congressional District shall vote at any such convention or primary meeting held for the purpose of making nominations to fill such vacancy.*'' The italicized portion was added by the amendment. There is no logical way of interpreting the actions of the Twenty-ninth Legislative Assembly otherwise than as an approval and confirmation of the holding of the court in the Duncan case.

It is, of course, well established that initiative Acts may be repealed, amended or changed by the legislative assembly. (State ex rel. Goodman v. Stewart, 57 Mont. 144, 187 Pac. 641; State ex rel. Bonner v. Dixon, 59 Mont. 58, 195 Pac. 841; State

ex rel. Jones v. Erickson, 75 Mont. 429, 244 Pac. 287.) Section 612, as now amended, relating as it does to political parties, is in conflict with the command of section 639 and both cannot stand. Under familiar rules of statutory construction the latest in point of time must control, which in this case is section 612 as amended.

The case of LaBorde v. McGrath, Mont., 149 Pac. (2d) 913, has been given consideration but that case was one where the vacancy had been filled by appointment to hold until the next ensuing general election. There it was held that no special election was involved in the case because the appointee held until the next general election at which time a successor would be elected to fill out the term and that the primary election should be resorted to for the purpose of nominating candidates to be voted upon at the general election. There is nothing in that case that departs from the Duncan case or that aids in the determination of this case.

Hence it follows that the nominees to be placed upon the ██ ballot at the special election to be held pursuant to the call of the Governor on June 5, 1945, must be chosen pursuant to section 612 as amended by Chapter 26, Laws of 1945, or by section 615, and not by a special primary nominating election.

Mr. Justice Adair dissenting:

The Honorable James F. O'Connor died on the 15th day of January 1945 while serving as the duly elected and qualified representative in the Congress of the United States from the second congressional district of the state of Montana.

The Constitution of the United States provides that, ''When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.'' (Article I, sec. 2.)

Empowered by the above constitutional provision, the Governor of the state of Montana on March 7, 1945, issued a proclamation calling for the holding of a special election, on June 5, 1945, in the several counties of the state comprising the second congressional district of the state at which the qualified

electors of such district shall elect a representative in Congress to fill the vacancy now existing.

No proclamation or writ of election has been issued calling for any primary nominating election or fixing any date for the holding of any primary nominating election for the choosing of candidates for the office to be filled by the political parties of this state.

How then may a qualified person who aspires to the seat in Congress left vacant by the death of Congressman O'Connor place his candidacy before the qualified electors of the second congressional district? What must he do to have his name printed on the ballot as a candidate at the June 5, 1945 election? How may he be nominated?

Three plans or methods of nominating candidates have been provided by the laws of this state. The first plan provides for the nomination of candidates by political parties at a convention or primary meeting of the party. The second plan provides for the nomination of independent candidates by independent electors irrespective of party affiliations. The third plan provides for the nomination of candidates representing the various political parties by the direct vote of the electors of such parties at a direct primary election held for such purpose.

Plan I—Nomination by Convention—Certificate by Secretary or President of the Convention.

By an Act passed by the sixteenth legislative assembly of the Territory of Montana and approved March 13, 1889, Laws of 1889, page 135, it was provided that candidates for public office to be filled by election may be nominated by a party convention or a party primary meeting held for that purpose. The Act defined a convention or primary meeting as "an organized assemblage of electors or delegates representing a political party or principle." Upon the selection of a nominee or candidate the secretary or president of the convention or primary meeting was required to make out and file with the secretary of the Territory and with the county clerk of the

respective counties wherein the officer was to be elected, certificates of nomination. The filing of the proper certificate of nomination with the secretary of the Territory and with the county clerks entitled the nominee so certified to have his name appear upon the ballot at the election. Subsequent legislation prescribed the qualifications of those entitled to vote at any caucus, primary meeting or election held by any political party and for the challenging of the right of any person offering to vote at such caucus or primary meeting. (Sections 623, 624 and 627, Revised Codes of 1935.) The early Act of the Territorial Legislature has been carried forward in the Codes since, being sections 521, 522 and 523 of the Revised Codes of 1907 and sections 612, 613 and 614 of the Codes of 1921 and 1935.

Plan II—Nomination by Independent Electors—Certificate by Independent Electors.

A second plan or method for the nomination of independent candidates for public office was provided by the above-mentioned Act of the Territorial Legislature. (Laws of 1889, page 135.) This second plan permits the nomination of independent candidates by the electors residing in the district to the number in the Act specified signing a certificate of nomination setting forth the name of the candidate for the office to be filled. When such certificate, bearing the signatures of not less than 5% of the number of votes cast for the successful candidate for the same office at the next preceding election, is filed with the secretary of the Territory and with the clerks of the counties participating in the election, such certificate, if filed in time, entitles the nominee to appear on the ballot as an independent candidate for the office to be filled.

The above provisions of the territorial Act of 1889 have since been carried forward in our Codes as sections 524, 525, 526, 527 and 528 of the Revised Codes of 1907 and sections 615, 616, 617, 618 and 619 of the Codes of 1921 and 1935.

Under the territorial Act the certificates of nomination were required to be filed with the secretary of the Territory not more than sixty days and not less than thirty days before the

date fixed by law for the election. In 1943 the Legislature amended the law to provide that the certificate of nomination filed with the secretary of state "Must Be Filed Not Less Than Ninety (90) Days Before the Date Fixed by Law for the Election." (Chapter 105, Laws of 1943.)

The territorial Act provided that not less than 20 nor more than 30 days before an election to fill any public office the secretary of the Territory must certify to the county clerks the name of each person nominated for such office. In 1943 the Legislature amended the law to provide that the Secretary of State must certify such nominees "not less than forty-five (45) nor more than ninety (90) days before an election to fill any public office." (Chapter 104, Laws of 1943.) Under the law as amended the election having been called for June 5th, the dead line for the certificate of the Secretary of State is April 20, 1945.

Plan III—Party Nominations by Direct Vote of the People— The Direct Primary Election.

Upon the failure of the Twelfth Legislative Assembly (1911), as well as previous assemblies, to enact legislation providing for political party nominations by the direct vote of the people, a number of leading citizens in this state of various political parties and faiths formed a non-partisan organization under the name of Peoples Power League of Montana for the purpose of drafting and proposing by initiative petition certain legislation to be submitted to a direct vote of the people at the general election of November 1912.

The measures so submitted by initiative petition were: (1) A bill for a law to provide for party nomination by direct vote of the people; (2) a bill for a law to provide for the expression by the people of the state of Montana of their preference of party candidates for president and vice-president of the United States, the election of delegates to presidential conventions and the nomination of presidential electors by direct vote; (3) a bill for a law to define, prevent and punish corrupt and illegal practices in nominations and elections and to secure

and protect the purity of the ballot; (4) a bill for a law reading, "That we, the people of the state of Montana, hereby instruct our representatives and senators in our legislative assembly, as such officers, to vote for and elect the candidates for United States Senator from this state who receive the highest number of votes at our general elections."

Initiative petitions were duly filed with the Secretary of State; the proposed measures were printed in pamphlet form and sent to the various county clerks in sufficient number to furnish one copy to every voter in his county, the law requiring each county clerk to mail to each registered voter in his county at least one copy of the proposed measures within 30 days from the date of the receipt of the pamphlets or measures from the Secretary of State. Incorporated in the printed pamphlet pertaining to the measure for party nominations by direct vote of the people, and so distributed to every registered voter in the state and as a part thereof was a brief of the proponents of the measures setting forth their respective names and addresses and setting forth the reasons for and purposes of the proposed measure as follows:

"Argument

"(Affirmative)

"Submitted by the People's Power League of Montana in favor of the measure designated on the official ballot as follows:

"Proposed By Initiative Petition

"(Here appears the form of ballot)

"The following list gives the names of the officers, executive and membership committees of the People's Power League of Montana:

"Officers.

"Miles Romney of Hamilton, President.

"Max McCusker of Livingston, Secretary-Treasurer.

"Executive Committee.

"Miles Romney, Hamilton; M. McCusker, Livingston; E. H. Goodman, Townsend; John Blewett, Fromberg; R. N. Suther-

lin, Great Falls; W. K. Harber, Fort Benton; C. S. Harter, Miles City; D. J. Donohue, Glendive; Dan Leary, Anaconda; James Holland, Havre; John F. Duffy, Kalispell; Edwin K. Cheadle, Lewistown; Walter S. Hartman, Bozeman; George A. Maywood, Philipsburg; James Jergensen, Whitehall; T. J. Walsh, Helena; D. M. Fitzpatrick, Missoula; Wolmer Hanson, Deer Lodge; W. E. Nippert, Thompson Falls; Lewis J. Duncan, Butte; H. W. Nelson, Billings.

## "Membership Committee

"Theodore Lentz, Missoula; Huburtus Corkish, Butte; E. C. Russel, Lewistown; O. H. P. Shelley, Helena; C. E. Sackett, Anaconda; M. M. Donoghue, Butte; W. M. Johnston, Billings.

"This league is a non-partisan organization. Its object is to extend and perfect the direct power of the voters over their state and local government in all its branches and officers— that the people may rule.

"We believe the approval of the above four measures by the people will provide practical methods by which the voters of Montana will be able effectively to use their supreme power over the officers as well as the laws of our state, county and city governments and at the same time have accurate and full knowledge of the subjects on which they act.

## "Direct Primary Law.

"The purpose of the direct primary law is to place the nomination of all candidates for public office directly in the hands of the voters, thereby eliminating the complicated caucus and convention system. The direct primary destroys the power of the corporation-controlled machine boss. Boss Tweed once said: 'You may elect whichever candidates you please to office, if you will allow me to select the candidates.'

"When the people nominate the candidates as well as elect the officers they have a government by the people and for the people. No man would think of having delegates or conventions do his voting at the general election, and it is even more important that he do his own voting at the nominating election. Men have died for the right to cast the ballot, and surely the

right to make the ballot is no less valuable or sacred than the right to vote it.

"For more than a decade the voters of Montana have been demanding direct primaries to the end that they might, under the protection of the Australian ballot system, nominate the candidates for public office. Both of the great parties and most of the legislative candidates, year after year, have pledged themselves to enact such a law, but for reasons best known to themselves, when entrusted with power, they have disregarded the public will. The patience of the public having been exhausted, the initiative and referendum have been invoked, and the people may now secure these laws by simply voting for each of the measures at the election to be held on November 5. Special ballots will be provided for this purpose.

"Primary election reform is sweeping the country. All but ten states now have direct primary laws. These backward states are Connecticut, Vermont, Rhode Island, Pennsylvania, Indiana, Delaware, North Carolina, West Virginia, Utah, and Montana. And in every one of these an effort is being made to throw off the yoke of the bosses.

"The reader is urged to read the text of each of the measures proposed. The first of these, the bill providing for party nominations by direct vote, contains the best features of the primary laws of Oregon and Wisconsin, the two most progressive states in the union. This bill has been passed upon by many of the best lawyers of the state, including Hon. T. J. Walsh, Judge Edwin K. Cheadle and Hon. Walter S. Hartman.

"A direct primary law voted by the people can be repealed only by a vote of the people, while a makeshift law enacted by a special session of the legislature could be repealed by the following legislative assembly. These initiative measures have been indorsed by the Montana Federation of Labor, by many local unions and by the progressives of all parties.

"Hon. William S. U'Ren, father of the initiative and referendum movement in Oregon, and who was chiefly instrumental in drafting and securing the enactment of the direct primary

law in Oregon in 1906, considers the law proposed for Montana an improvement over the Oregon law, as is evidenced by the following letter:

"'Oregon City, Ore., April 22, 1912

" 'Mr. Miles Romney, Hamilton, Mont.

" 'Dear Sir:—I am glad to have the good news of yours of the 18th inst. I think the Wisconsin plan of the closed primary is better than ours, and certainly is for your state. I enclose under separate cover copies of all the literature I have on this subject. I shall be glad to render you any assistance in my power.

" 'Sincerely yours, William S. U'Ren.'

"Corrupt Practices Act.

"The Corrupt Practices Act (Official Ballot 304) is an essential complement to the direct primary law. The direct primary law is incomplete without it. This was demonstrated by the nomination of Stephenson, and the people of Wisconsin at once overhauled and made effective their Corrupt Practices Act. Two years after the enactment of the direct primary law in Oregon a corrupt practices act was secured through the initiative. Colorado is to vote in November on a corrupt practices act initiated by the people. Because money gets into conventions and legislatures and thwarts the public will, the people are adopting modern election machinery, and it is worthy of note that in every state where the direct primary has been adopted, a stringent corrupt practices act has been passed. The corrupt practices act is the logical development of the direct primary system, just as the primary system was the logical development of the Australian ballot system.

"The Other Bills.

"The bills relating to the expression of the popular choice for United States senator and president of the United States are a part of the system that has been already adopted by many of the states and are generally understood.

"Respectfully submitted to the voters of Montana by the

"People's Power League of Montana"

Each and all of the four measures so initiated were passed by the people of Montana at the general election of November 1912. The measure providing for party nominations by direct vote of the people was initiated by an overwhelming vote of almost 4 to 1 and thus was placed in the law of the state of Montana a new plan or method of nominating party candidates for public office. The law as originally initiated contains 39 separately numbered sections.

It will be observed that in the printed pamphlet furnished to every registered voter in the state prior to the November 1912 election the proponents of the above-mentioned measures in their opening sentence stated: ''The purpose of the direct primary law is to place the nomination of all candidates for public office directly in the hands of the voters, thereby eliminating the complicated caucus and convention system.''

The ''eliminating'' of the caucus and convention system was and is provided for in section 8 of the initiated measure, Laws 1913, p. 570, which provides: ''Every political party shall nominate all its candidates for public office under the provisions of this law, and not in any other manner; and it shall not be allowed to nominate any candidate in the manner provided by Section 521, of the Revised Codes of Montana, 1907.''

The above language is simple. It is clear. It admits of no doubt or uncertainty. It positively prohibits any political party in this state from nominating any party candidate for any public office in this state by the party caucus, the party convention or by the party primary meeting theretofore used and employed by the political parties in this state. It expressly eliminated the nomination of party candidates by any political party in any other means or manner than is provided under the provisions of the direct primary law. It expressly said a political party ''shall not be allowed to nominate any candidate in the manner provided by Section 521, of the Revised Codes of Montana, 1907.''

By this plain mandate the people of the state of Montana said that henceforth the political parties of this state must use

the new machinery, the new direct primary method, this Plan III, for the nomination of all candidates running as party candidates or bearing the party label and that henceforth no political party shall be allowed to use the Plan I method of nominating any party candidate.

In 1927 the Legislature, by the enactment of Chapter 7 of the Session Laws of 1927, amended the first sentence of section 8 of the original initiative measure to read: "Every political party *which has cast three per centum (3%) or more of the total vote cast for Representative in Congress at the next preceding general election in the county, district or state for which nominations are proposed to be made,* shall nominate its candidates for public office *in such county, district or state,* under the provisions of this law, and not in any other manner; and it shall not be allowed to nominate any candidate in the manner provided by section 612 of this Code." The italicized portion is new matter added by the amendment.

By the above amendment the Legislature sought to limit the application of section 8 of the original measure, now section 639, Revised Codes, to the two major parties and thus under present conditions and facts to permit political parties which cast less than three per centum of the total votes cast for Representative in Congress at the general election of November 1944 to nominate by the party caucus, or party convention, or party primary meeting (Plan I) method but the amendment in no manner relieved the two major political parties from the express prohibitions enacted in section 8 of the original initiative measure.

In case of the death of a party's candidate or his removal from the state or county or district after being nominated but before the date of the ensuing election, then and in such event "but in no other case", it was expressly provided in section 16 of the original initiative measure (now section 647, Revised Codes) that such vacancy may be filled by the committee which has been given the power by the political party or the direct primary law to fill such vacancies substantially in the manner

provided by sections 529 and 530, Revised Codes of Montana, 1907, sections 620 and 621, Revised Codes of Montana of 1935. It will be noted that the vacancy to be filled by this method is one occasioned by the loss of the party's nominee after he has been chosen but before he has been elected to office and that it does not apply to a vacancy in the office itself occurring subsequent to the election.

The people of this state who pioneered the direct primary election law foresaw that controversies would arise from time to time over the various provisions of the measure and in the very first section of the original act they pleaded that those to whom is intrusted the execution or the interpretation of the primary election law be reasonable and not too prone to search for doubtful or uncertain meaning or for explicit direction and details in all things ''to the end that the protection of the spirit and intention of said laws [the general laws of Montana] shall be extended so far as possible to all primary elections, and especially to all primary nominating elections provided for by this law.'' (Section 631, Revised Codes of 1935.)

Plan I, i. e., the party convention plan, was employed by the Socialist party of Montana for nominating its candidates for state offices to be voted on at the general election of November 7, 1922. The nominations so made were approved by this court in State ex rel. Mills v. Stewart, 64 Mont. 453, 210 Pac. 465.

Plan II, i. e., the nomination of an independent candidate, without party designation or label, by the petition of individual electors to the number specified in the statute, was employed to nominate Park Smith as an independent candidate for the office of State Senator from Lewis and Clark county at a special election called for December 28, 1918 for the purpose of filling the seat in the State Senate left vacant by the death of the incumbent Frank D. Miracle. The nomination so made was approved by this court in State ex rel. Reibold v. Duncan, 55 Mont. 380, 177 Pac. 250.

Plan III, i. e., the nomination of party candidates by the direct vote of the electors of the party at a primary nominating

election, was employed to select candidates for the office of county treasurer of Silver Bow county. At the general election of November 3, 1942, William McPhail was elected county treasurer for a term of four years to commence on the first Monday in March 1943. Following such election he qualified for the office but on January 22, 1943, before the commencement of his term, he died whereupon, empowered by Article XVI, section 5 of the Constitution of Montana, the county commissioners appointed Phemia McPhail to fill the vacancy and she qualified and assumed the duties of the office on the first Monday in March, 1943. The Constitution, Sec. 5, Art. XVI, provides that "the appointee shall hold his office until the next general election" and prior to the primary election of July 1944 certain persons filed nominating petitions as candidates for the nomination of either the Democratic party or the Republican party for the office of county treasurer for the unexpired term. The plan of nomination so adopted (Plan III) was approved by this court in LaBorde v. McGrath, Mont., 149 Pac. (2d) 913, 916, decided less than one year ago wherein the court said: "It is quite apparent from the language and purpose of the Act that the people of this state, in initiating the measure, sought to curb and correct the alleged abuses obtaining under the convention and caucus methods of nominating candidates by making the provisions of the Primary Nominating Election Law generally applicable in all situations wherein they could be made reasonably operative."

In State ex rel. Mills v. Stewart, supra, this court held that the evidence therein showed that the Socialist party of Montana was not in existence as a political party organization at the time of the August 1922 primaries. In September 1922, following the primary election, a call was issued for a mass convention of all voters of Montana who adhered to the principles of the national Socialist movement for the purpose of organizing and establishing the legal status of the Socialist party in this state and for the purpose of nominating candidates for state offices. The convention so called met on Septem-

ber 30, 1922, organized and nominated candidates for state offices. At this time the primary nominating election for the selection of party candidates to be voted on at the regular general election had already been held in August preceding. Following the party convention a certificate of nomination was filed with the Secretary of State. An action was brought to restrain him from certifying the names of the persons on the certificate for a place on the ballots to be used at the general election to be held on November 7, 1922. In denying the writ the court held that the case is governed by the decision of this court in the case of State ex rel. Richardson v. Stewart, Secretary of State, 58 Mont. 707, 198 Pac. 1118, wherein the court held "that, since it appears that the Farmer-Labor Party was not in existence at the time the primary election was held on April 23, 1920, for presidential and vice presidential electors, but has been organized since that time, it is now entitled to have the names of its candidates for these offices placed upon the ballot under the provisions of section 521 of the Revised Codes." The court further held in State ex rel. Mills v. Stewart, supra [64 Mont. 453, 210 Pac. 466], that if the Socialist party of Montana had been organized and in existence as a political party at the time of the primary nominating election of August, 1922, that "then under the express provision of section 639, Revised Codes 1921, it is not entitled to have the name of any person appear upon the ballots as a candidate for any state office at the general election", citing as its authority the case of State ex rel. Williams v. Stewart, Secretary of State, 58 Mont. 708, 198 Pac. 1118, wherein the court said: "The court is of the opinion that since the Socialist Party was organized and in existence at the time the primary election was held on April 23, 1920, for presidential and vice presidential electors, and was entitled and required under the provisions of the act initiated and passed by the people at the general election held in November, 1912 (Laws 1913, p. 590), to vote for and nominate candidates for these offices, but omitted to do so, it is not entitled now to have the names of

any persons appear upon the ballot as candidates for these offices."

State ex rel. Smith v. Duncan, 55 Mont. 376, 177 Pac. 248, and the companion case of State ex rel. Reibold v. Duncan, 55 Mont. 380, 177 Pac. 250, arose from the same facts. At the general election held in November 1916, the electors of Lewis and Clark county elected a State Senator to represent such county in the state legislative assembly for a term of four years commencing on the first Monday in January 1917. Such Senator qualified and represented the county in the fourteenth legislative assembly following which session he resigned. To fill the seat so left vacant and for the unexpired term, Frank D. Miracle was nominated for the office by the Republican party and Ira F. Wight was nominated by the Democratic party. At the general election held in November 1918, Mr. Miracle received more votes than Mr. Wight and became the duly elected Senator to fill the unexpired term aforesaid. Seventeen days after his election, Senator Miracle died and five days thereafter the Governor, empowered by the provisions of section 45 of Article V of the Constitution of Montana and section 452, Revised Codes of 1907, being section 533, Revised Codes of 1935, called a special election in Lewis and Clark county for December 28, 1918, to elect a Senator to fill the vacancy and five days thereafter (December 2, 1918) the board of county commissioners issued its proclamation for such special election. The question then arose: How may candidates for the office to be filled be nominated? How may their names be properly placed on the ballots to be used at the special election?

On November 30, 1918, the Republican county central committee, acting through its executive committee, assumed to nominate Park Smith as the party candidate of the Republican party for State Senator and certified his nomination to the county clerk, who refused to file the certificate. Whereupon, application was made for a writ of mandate to require the county clerk to file the certificate and place Park Smith's

name on the ballot as the candidate of the Republican party.' In State ex rel. Smith v. Duncan, supra [55 Mont. 376, 177 Pac. 250], this court held "that the committee has not any authority under the primary law or other statutes to make an original nomination, as was attempted in this instance." In the course of its opinion the court said:

"Under the convention system of nomination the central committee never had authority to make original nominations. It was only after a duly constituted convention had made a nomination and a vacancy occurred before the election that the committee was authorized to act. It did not make an original nomination, but merely filled the vacancy. But counsel for plaintiff rely upon the provisions of section 32 of the Direct Primary Election Law (Laws 1913, p. 570) for the authority exercised by the committee in this instance. Was it the purpose of that act to clothe the central committee with power to make a nomination originally? We think not. Such a construction of the language of section 32 would lead to a result at war with the intent and purpose of the entire measure. It is entitled 'A law to provide for party nominations by direct vote,' and the title of a statute is indicative of the legislative intent in passing it.

"Within the compass of this Act it was clearly the purpose to confer the power to make original nominations upon the electors voting at a primary election. If we eliminate from the act the idea of direct nominations by the electors, nothing whatever of consequence remains. In order to interpret the statute, that fundamental purpose must be kept constantly in view, and every section of the act read with that idea in mind.

\* \* \* \* \*

"Finally it is insisted that since Mr. Miracle was nominated at the primary nominating election held in August last, his death after election created a vacancy within the meaning of section 32 above, and that the committee did nothing more than fill that vacancy. We are unable to appreciate the subtle refinement of reasoning which would justify such a conclusion.

If at the time of his death Mr. Miracle was a candidate for state senator, then his death created a vacancy which the committee could fill. If he was not such a candidate, then his death created a vacancy in the office of state senator, but not a vacancy in the candidacy of the Republican nominee. Mr. Miracle was elected to office on November 5th, and when the polls closed on that day he ceased to be a candidate."

Plan II was resorted to by Charles Reibold and 283 other qualified electors of Lewis and Clark county who joined in a certificate, nominating Park Smith as an independent candidate for State Senator without any party designation or label. These electors, proceeding under the provisions of section 524 of the Revised Codes of 1907, presented their signed certificate to the county clerk for filing to the end that the name of Park Smith would appear on the ballots at the special election as an independent candidate for the office. Upon the refusal of the clerk to file the certificate, application was made to this court, (State ex rel. Reibold v. Duncan, supra,) for a writ of mandate to require the clerk to file the electors' certificate. The only issue involved was whether or not the electors had the right to certify Park Smith as an independent candidate for the office to be filled at the special election called for December 18, 1918. In other words, was the method of nominating independent candidates provided for by section 524, Revised Codes of 1907 (Plan II) available or had section 524 been repealed by the adoption of the initiative measure of 1912 providing for party nominations by direct vote of the people (Plan III)?

This court held that the adoption of the direct primary law (Plan III) did not operate to repeal section 524, Revised Codes of 1907 (now section 615, Revised Codes of 1935); that the method provided by said statute (Plan II) was available, and it ordered a peremptory writ to issue directing the county clerk to file forthwith the certificate of nomination of Park Smith as the electors independent candidate.

As above stated, all the court was called upon to decide in

the Reibold Case, supra, was whether section 524 of the Revised Codes of 1907, relied upon in nominating Park Smith, had been repealed by the direct primary law (Laws 1913, p. 570). "The court passed upon that decisive question, and whatever else was said is *obiter dictum."* (Meyer v. Lemley, 86 Mont. 83, 95, 282 Pac. 268, 271.)

It was not contended that section 8 of the original direct primary law (Laws of 1913, p. 570) effected a repeal of section 524, Codes of 1907, and it certainly was not necessary for the decision of the Reibold Case that this court construe or give its interpretation of said section 8 of the initiative measure. No one had attempted to use any of the machinery provided in the direct primary law for the nomination of any candidate to be balloted on at the December 18, 1918 election. Park Smith had not been nominated under the direct primary law and his nomination rested solely upon the compliance with section 524, Revised Codes of 1907, and not upon any procedure or method provided for in section 8 of the direct primary law. Under such state of facts, what the court said in the Reibold Case concerning section 8 and other matters relating to the direct primary law is *obiter dictum.* (Cox v. Tyrone Power Enterprises, 49 Cal. App. (2d) 383, 121 Pac. (2d) 829, 838; Miller, Royal Indemnity Co., Intervener, v. Board of Com'rs of Port of New Orleans, 199 La. 1071, 7 So. (2d) 355.) Such statements do not become precedents and while they may be respected they ought not to control the judgment in a subsequent proceeding when the very point is presented for decision. (People v. Gravenhorst, Misc., 32 N. Y. Supp. (2d) 760, 774; Mettler v. Ames Realty Co., 61 Mont. 152, 201 Pac. 702.)

"An *obiter dictum* is a gratuitous opinion, an individual impertinence which, whether it be wise or foolish, right or wrong, bindeth none—not even the lips that utter it." (Empire Theatre Co. v. Cloke, 53 Mont. 183, 191, 163 Pac. 107, 109.)

Not only did the court indulge in *obiter dictum* in the Reibold case but it assumed to rewrite section 8 of the Act initiated and adopted by the people of this state, by inserting words in

section 8 which the court considered the people had overlooked or omitted. In the Reibold case at pages 382 and 383 of 55 Mont., at page 251 of 177 Pac., the court said: ''Under the construction we adopt, the meaning of section 8 and the repealing clause becomes manifest. The opening sentence of section 8 would read: Every political party shall nominate all its candidates for public office [*to be voted for at a general election*] under the provisions of this law and not in any other manner, and it shall not be allowed to nominate any candidate [*to be voted for at a general election*] in the manner provided by section 521 of the Revised Codes, etc.'' The court in December 1918 inserted into the people's initiative measure adopted at the general election of November 1912 the 16 italicized words enclosed in brackets in the above quotation from the Reibold Case.

What right had the court in interpreting section 8 to insert what it deemed has been omitted? Section 10519, Revised Codes of 1935, which has been on the statute books continuously since territorial days (1877) provides: ''In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.''

If the court had power to add 16 words in section 8 of the law, it had the power to add another section to the law. It would have been much more direct and simple for the court to have added at the end of the law another section numbered 40 and reading: ''This Act shall not apply to any special election.'' Such an addition would have effected the same result and taken only nine words as against the sixteen words inserted by the court.

The exception in section 2 of the original Act (section 632, Revised Codes) is only an exception as to the date and not as to the law. The direct primary law applied to municipal elec-

tions, to the election of presidential electors, to school elections, etc., all of which were held on dates other than is prescribed in section 632, Revised Codes.

To ascertain the plain purpose of the law, the court need only keep in mind the opening sentence of the printed argument for the measure submitted to the electors of this state with the proposed measure, namely "The purpose of the direct primary law is to place the nomination of all candidates for public office directly in the hands of the voters, thereby eliminating the complicated caucus and convention system." Webster's New International Dictionary, 2nd Ed., defines the verb "eliminate" thus: "1. To put out of doors; to thrust out; 2. To remove and get rid of by disengaging from environment or association; expel; exclude." If the meaning of section 8 of the primary law was not of doubtful or uncertain meaning then there was no occasion for the court to insert in the section the sixteen additional words which the court wrote in the law and enclosed in brackets. On the other hand, if section 8 proved to be of doubtful or uncertain meaning, which I do not concede, then the court was admonished by section 10519, Revised Codes, to adopt such a construction of section 8, if possible, as will give effect to all of the remaining 38 sections comprising the direct primary law and the court was further enjoined by section 1 of the initiated law (now section 631, Revised Codes of 1935) to so interpret and construe the law "that the protection of the spirit and intention of said laws shall be extended so far as possible to all primary elections, and especially to all primary nominating elections provided for by this law."

My brothers decline to repudiate the *obiter dictum* of the Reibold case, supra, wherein the only question presented for decision was whether the primary law operated to repeal section 524 of the 1907 Codes, section 615, Revised Codes of 1935. The argument is that there have been various legislative assemblies since the decision was rendered and that none of the assemblies has seen fit to remove the *obiter dictum* from the case or to correct the errors committed by this court therein.

The argument is both startling and unsound. Since when must this court proceed in error until and unless it is corrected or impeached by the Legislature? Cannot this court get right when once it goes wrong without first having its false and erroneous doctrines repudiated by the legislative branch of the government?

In Helvering v. Hallock, 309 U. S. 106, 84 L. Ed. 604, 60 S. Ct. 444, 451, 125 A. L. R. 1368, the Supreme Court of the United States said: "We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience. * * *

"Nor does want of specific Congressional repudiations of the St. Louis [Union] Trust Co. Cases [Helvering v. St. Louis Trust Co., 296 U. S. 39, 56 S. Ct. 74, 80 L. Ed. 29, 100 A. L. R. 1239; Becker v. St. Louis Trust Co., 296 U. S. 48, 56 S. Ct. 78, 80 L. Ed. 35] serve as an implied instruction by Congress to us not to reconsider, in the light of new experience, whether those decisions in conjunction with the Klein Case [Klein v. United States, 283 U. S. 231, 51 S. Ct. 398, 75 L. Ed. 996], make for dissonance of doctrine. It would require very persuasive circumstances enveloping Congressional silence to debar this Court from re-examining its own doctrines. To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities. * * * Congress may not have had its attention so directed for any number of reasons that may have moved the Treasury to stay its hand. But certainly such inaction by the Treasury can hardly operate as a controlling administrative practice, through acquiescence, tantamount to an estoppel barring re-examination by this Court of distinctions which it had drawn. Various considerations of parliamentary tactics and strategy might be suggested as rea-

sons for the inaction of the Treasury and of Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.

"This Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction. * * * By imputing to Congress a hypothetical recognition of coherence between the Klein [supra] and the St. Louis [Union] Trust Co. Cases [supra], we cannot evade our own responsibility for reconsidering, in the light of further experience, the validity of distinctions which this Court has itself created. Our problem then is not that of rejecting a settled statutory construction. The real problem is whether a principle shall prevail over its later misapplications. Surely we are not bound by reason or by the considerations that underlie *stare decisis* to persevere in distinctions taken in the application of a statute which, on further examination, appear consonant neither with the purposes of the statute nor with this Court's own conception of it. We therefore reject as untenable the diversities taken in the St. Louis [Union] Trust Co. Cases [supra] in applying the Klein doctrine [supra]—untenable because they drastically eat into the principle which those cases professed to accept and to which we adhere.''

On July 29, 1919, the Legislature met in extraordinary session to consider matters connected with drought conditions in this state, and, on request of the assembly, the Governor specially authorized them to take action with reference to the primary laws pursuant to which power the Legislature enacted Chapter 28, Laws of Extra. Session 1919, amending the direct primary election law initiated by the people in 1912. The law initiated by the people provided for an ''open'' primary and the Act of the Legislature changed it to a ''closed'' primary. Thereupon the people called for a referendum and at the general election held November 2, 1920, by popular vote they rejected the Act of the Extraordinary Session of the Legisla-

ture, Chapter 28, Laws of Extra. Session 1919, attempting to amend the original primary law, Laws of 1921, pp. 704, 705.

Subsequent to the death of Congressman O'Connor the twenty-ninth legislative assembly (1945) amended section 612, Revised Codes of 1935 (Sec. 521, Codes of 1907) but it must be remembered that section 8 of the direct primary law provided that a political party "shall not be allowed to nominate any candidate in the manner provided by Section 521, of the Revised Codes of Montana, 1907" while Chapter 7 of the Laws of 1927 expressly prohibits every political party which cast 3% or more of the total vote cast for representative in Congress in the district at the next preceding general election, from nominating any candidate in the manner provided by section 612 of the Code. This express prohibition at the present time applies to the Democratic party and to the Republican party in this state and the amendment of section 612, Revised Codes, by an Act which not only fails to repeal but fails to even refer to section 639, Revised Codes, most certainly cannot be said to authorize the two major parties to disregard the express prohibitions of section 639, Revised Codes (Plan III), and to nominate party candidates under the old party convention method (Plan I) provided for in section 612, Revised Codes, where only minor parties casting less than 3% of the total vote cast for representative in Congress may nominate party candidates.

If the primary contained nothing other than the first sentence of section 639, Revised Codes, still there would remain the absolute and unequivocal prohibition against the nomination by the major parties of candidates under section 612, Revised Codes, and the 1945 amendment fails to remove that prohibition.

It is clear that under the present law three methods are available for nominating candidates to fill the seat left vacant by the death of Congressman O'Connor: Plan I, i. e., party nomination by party convention under section 612, Revised Codes, may be employed by any minor political party which cast less than 3% of the total vote cast for representative in

Congress in the second congressional district at the general election held in November 1944. But by reason of section 639, Revised Codes, the two major parties may not nominate their candidates in the manner provided by section 612, Revised Codes. ( State ex rel. Mills v. Stewart, supra.)

Plan II, i. e., the nomination of independent candidates, may be made by signatures of the requisite number of electors under section 615, Revised Codes, the nominees to be without party designation. (State ex rel. Reibold v. Duncan, supra.)

Plan III, i. e., party nominations by the direct vote of the people at a primary election, is the only method now available for the nomination of party candidates by the Democratic party or the Republican party in this state in view of the prohibitions of section 639, Revised Codes. (LaBorde v. McGrath, supra.)

By section 2 of Article I of the Constitution of the United States, the executive authority of the state is empowered to issue writs of election to fill the vacant seat in Congress. The authority so conferred authorizes the issuance of such writs as may be required to place in motion all necessary election machinery of the state whether the writ issue for a primary nominating election or for a special election. There is no specific law that requires the special election be held on June 5th or on any other particular day and there is likewise no specific law that fixes any particular day for the holding of a primary nominating election. The calling of a primary nominating election and of a special election are matters within the discretion of the executive authority of the state. The time for the holding of such elections should be influenced by the convenience of the electors generally, having in mind the general laws of Montana, and especially the election and registration laws, and the customs, practice, usage, and forms thereunder. (Section 631, Revised Codes.)

Without the issuance of a writ or proclamation calling for a primary nominating election, I fail to see how the two major parties may lawfully nominate party candidates to fill the

vacant seat. While I find an express prohibition in the law, (sec. 639, Revised Codes), against nominations by the two major parties in the manner provided by section 612, Revised Codes, yet I find no prohibition, express or implied, to the calling of a primary nominating election for the purpose of permitting the electors comprising the two major parties to express their preference by direct vote and to nominate properly qualified persons to represent their respective parties and principles as candidates for the office of representative in Congress from the second congressional district.

By the vote of 46,437 electors the direct primary law was adopted. By the popular vote of 74,079 electors the Act of the legislative assembly (1919) effecting various repeals and changes in the law was rejected. By *obiter dictum* indulged in by three judges in the Reibold case (1918) it was announced that the direct primary law does not apply to any special election. For the first time since the adoption of the primary law a case is before this court squarely presenting the issue as to whether the two major political parties of this state are not required to use the direct primary election machinery for nominating party candidates for a public office to be filled by the electors at a special election called for that purpose.

In this determination this court should take into consideration the face of the direct primary law; the history of its initiation and adoption including the contemporaneous declaration of the proponents of the measure; the evils to be remedied and the natural or absurd consequences of any particular interpretation. (State ex rel. Goodman v. Stewart, 57 Mont. 144, 187 Pac. 641.)

These factors I have considered and I am of the opinion that the *obiter dictum* in the Reibold Case should be repudiated by this court and that the express prohibitions of section 639, Revised Codes, require the calling of a direct primary election for the nomination of candidates by the two major parties for the office to be filled.

The words of the law are that the major parties "shall not

194

be allowed to nominate any candidate in the manner provided by section 612 of this code.'' (Section 639.) The law should be obeyed.