JAMES E. COTTINGHAM, Plaintiff and Appellant, v. STATE BOARD OF EXAMINERS, etc., Defendants and Respondents. Harvey Sanders, Intervenor and Respondent.

No. 9869.

Submitted January 13, 1958. Decided July 15, 1958.

328 Pac. (2d) 907.

(1)

Floyd O. Small, Clayton R. Herron, Helena, for appellant. Floyd O. Small argued orally.

Forrest H. Anderson, Atty. Gen., and Gordon R. Bennett, Asst. Atty. Gen., argued orally for respondent.

Gene Picotte and C. E. Pew, Helena, argued orally for intervenor.

MR. CHIEF JUSTICE HARRISON:

This is an appeal from the judgment of the district court of the first judicial district dismissing the action of the plaintiff and dissolving the temporary restraining order theretofore granted.

Initiative Measure No. 54 (Laws of 1951, page 781), hereinafter referred to as "Initiative 54," adopted by the general

electorate at the 1950 general election, provided for payment of an honorarium to Montana veterans of World War II; the sale of bonds to provide funds for such payment; and the levy of a cigarette tax, the proceeds of which were to be used to redeem and pay interest on the bonds. The constitutionality of Initiative 54 was established in the case of State ex rel. Graham v. Board of Examiners, 125 Mont. 419, 239 Pac. (2d) 283.

The Thirty-fifth Montana Legislative Assembly enacted an amendment to Initiative 54 by passage of Substitute House Bill No. 3 (Chapter 44 of the Laws of 1957, hereinafter referred to as ''Chapter 44'') providing for payment of an hororarium to Montana veterans of the Korean war on substantially the same basis as veterans of World War II were paid under Initiative 54; the sale of $6,000,000 worth of bonds to provide funds for such payment; and the levy of an additional cigarette excise tax, the proceeds of which were to be used to redeem and pay interest on the bonds.

Pursuant to Chapter 44, collection of a one cent per package excise tax was commenced on February 26, 1957, and has continued to the present time. On the authority of Chapter 44, respondent, State Board of Examiners, passed a resolution on June 12, 1957, authorizing issuance and sale of certain described bonds in the amount of $6,000,000 for the purpose of providing funds for the payment of the Korean veterans' honorarium, the bonds to be redeemed with funds collected from the cigarette excise.

On July 23, 1957, appellant filed a complaint and petition for writ of injunction in the district court of the first judicial district, in which the alleged Chapter 44 is invalid and cannot ever become effective in that:

(1) It creates a debt or liability in excess of $100,000 without having been submitted to the people at a general election as required by section 2, Article XIII, of the Montana Constitution;

(2) It creates a debt or liability without having been submitted to the taxpaying electors of the State of Montana at an

election as required by section 2, Article IX, of the Montana Constitution;

(3) It violates section 27, Article III, of the Montana Constitution and section 1 of the Fourteenth Amendment to the Constitution of the United States, in that it deprives persons of their property without due process of law by levying an excise tax on cigarettes which is excessive;

(4) It impairs the obligation of the State of Montana to the holders of War Veterans' Compensation Bonds dated April 1, 1952, issued under the provisions of Initiative 54, in violation of section 2, Article III of the Montana Constitution;

(5) It is void for uncertainty in that it provides in section 14-A, added to Initiative 54 by section 6 of said Chapter 44, that the money arising from the sale of the $6,000,000 bonds authorized thereby shall be used to pay the expense of administration of Chapter 44, and also provides in the amendment of section 84-5621 of the Revised Codes of Montana of 1947, made by section 7 of Chapter 44, that the War Veterans' Compensation Bond Retirement Fund No. 2, into which the proceeds of the additional cigarette excise tax levy are to be paid, shall be used not only for payment of the bonds and the interest thereon but also for the payment of the expenses of administration of Chapter 44; and

(6) It provides in the amendment of section 84-5621, R.C.M. 1947, which amendment is made by section 7 of said Chapter 44, that the War Veterans' Compensation Bond Retirement Fund No. 2 shall be used for the payment of the expenses of administration of Chapter 44, thereby requiring payments out of the state treasury without appropriation therefor, in violation of section 34, Article V, of the Montana Constitution, and, if held, to be an appropriation for a longer term than two years, in violation of section 12, of Article XII, of the Montana Constitution.

Appellant prayed that Chapter 44 be declared null and void and not a law of the State of Montana; that the court temporarily restrain respondents from issuing bonds under the au-

thority of Chapter 44; and that respondents be directed to show cause why said temporary restraining order should not be made permanent.

The court below issued the temporary restraining order prayed for by appellant and granted an order to show cause returnable August 15, 1957.

On his petition and by stipulation of the parties, the court allowed intervention of Harvey Sanders in behalf of the respondents.

On August 15, respondents demurred generally to appellant's complaint, and argument of counsel for respondents, appellant, and intervenor was duly heard.

Respondents' demurrer was sustained August 20, and, appellant electing not to plead further, judgment was given for respondents, the court dismissing the action with prejudice and dissolving the temporary restraining order. Appellant now appeals from the judgment of the district court. The issues presented are set out in the appellant's complaint above.

The pertinent parts of Chapter 44 necessary to be considered are as follows:

"Whereas, the Korean war began before the submission of Initiative No. 54, adopted by the vote of the people of Montana at the regular general election of November 7, 1950, but too late to permit the inclusion in the provisions of said act of persons in the military service during said Korean war; and

"Whereas, it was the intent of the people of Montana to recognize by the honorarium provided in said Initiative No. 54 all residents of Montana rendering military service on behalf of said state in the then emergency; and

"Whereas, said Korean war was a recrudescence of said World War II and properly includable within the provisions of said Initiative No. 54, Now Therefore,

"Be in enacted by the Legislative Assembly of the State of Montana:

\* \* \* \* \* \*

"Section 5. That Section 12 of said Initiative No. 54 be, and the same is hereby amended so as to read as follows:

" 'Section 12. For the purpose of providing for the payment of the honorarium, or adjusted compensation, herein provided for and for paying the expenses of administration of this law, there shall be issued and sold under the direction and supervision of the board of examiners, limited obligations bonds of the State of Montana in the sum of twenty-two million dollars ($22,000,000.00) or in such sum within that amount as may be necessary for such purposes. Such bonds shall distinctly state that they are not and shall never be or become a general obligation of the State of Montana, but shall be payable only from the proceeds of a cigarette tax in the manner in this law provided; shall contain the pledge of the State of Montana to continue to levy and collect the cigarette tax in this law provided for and place the proceeds thereof in the War Veterans' Compensation Bond Retirement Fund, until all bonds issued hereunder, and the interest accruing thereon, shall have been paid; shall draw interest at the rate of not more than four *and one-half* percent (4½%) per annum, payable semi-annually; * * * Such bonds shall be signed by the members of the board of examiners and be issued under the great seal of the State of Montana, and a record of all such bonds issued and sold shall be made in the office of the state treasurer. * * * *Provided, however, that if the moneys derived from said first issue of twenty-two million dollars ($22,000,000.00) of bonds as in this Section above provided shall be insufficient to pay all claims heretofore filed with and heretofore or hereafter allowed by said board of examiners under the original provisions of said Initiative No. 54 as heretofore amended, and to pay all claims filed and allowed under this amendatory act, together with the expenses of administration of this amendatory act, there shall be issued and sold under the direction and supervision of the board of examiners of the State of Montana limited obligation bonds of the State of Montana in the further sum of six million dollars ($6,000,000.00) or in such sum within that amount as may be*

8

necessary for such purposes. The issuance of such bonds shall be made in the same manner and such bonds shall be subject to the same limitations, restrictions, and provisions as apply to said original issue of twenty-two million dollars ($22,000,000.00), except that such bonds shall draw not more than four and one-half per cent (4½%) interest and shall be payable only out of a cigarette tax as hereinafter provided in this amendatory act.'

"Section 6. That there is hereby added to said Initiative No. 54 a new section to be numbered Section 14-A, to read as follows:

"Section 14-A. The money arising from the sale of such said additional bonds in the amount of six million dollars ($6,000,-000.00) in this amendatory act above-provided for as may be sold as herein provided shall be deposited in the state treasury to the credit of the special fund created by said Initiative No. 54 and known as the 'War Veterans' Compensation Fund,' and the moneys now in said fund, after payment of all claims heretofore filed with and heretofore or hereafter allowed by the board of examiners under the original provisions of said Initiative No. 54, shall, together with such additional funds as may be derived from the sale of bonds under the said issue of six million ($6,000,000.00) authorized by this amendatory act, be used to pay said honorarium granted by subdivisions (b), (c), and (d) of Section 2 hereof, and by Section 3 of said Initiative No. 54 as hereby amended, and the expenses of administration of this amendatory act. For the purpose of carrying out the provisions of this amendatory act there is hereby appropriated from the War Veterans' Compensation Fund, in addition to the appropriation made by Section 14 of said Initiative No. 54 as originally enacted, the moneys now remaining in said fund and not needed for the payment of the honorarium to persons who served in World War II, and the sum of six million dollars ($6,000,-000.00), or so much thereof as may be necessary to pay said honorarium to the persons who served in the military forces in said Korean War.

"Section 7. That section 16 of said Initiative No. 54 be, and the same is hereby amended to read as follows:

\* \* \* \* \* \*

" 'Section 84-5621. \* \* \* All taxes levied, imposed and assessed under the provisions of subdivision (2) of said section 84-5606 shall, when collected, be paid to the state treasurer and credited to a special fund known as the War Veterans' Compensation Bond Retirement Fund, which fund shall be kept segregated from all money in the state treasury and shall, while any of the bonds hereafter issued and sold for the purpose of paying an honorarium, or adjusted compensation, to the residents of Montana who were in military service in the military forces of the United States in World War II, or any of the interest thereon, remain unpaid, be available for the payment thereof.

" 'All moneys derived from such additional tax shall be paid to the state treasurer and credited to a special trust fund to be known as the War Veterans' Compensation Bond Retirement Fund, which shall be kept segregated from all money in the state treasury and shall, while any of the bonds herein authorized or any interest thereon remain unpaid, be available solely for the payment thereof.'

"*All taxes levied, imposed and assessed under the provisions of Subdivision (3) of said Section 84-5606 shall, when collected, be paid to the state treasurer and credited to a special fund to be known as the War Veterans' Compensation Bond Retirement Fund No. 2, which fund shall be kept segregated from all other money in the state treasury and shall, while any of the bonds hereafter issued and sold, in addition to the twenty-two million dollars ($22,000,000.00) authorized by said Initiative Measure No. 54, as originally enacted, or any of the interest upon such additional bonds, remain unpaid, be used only for the payment thereof, and of the expenses of administration of this act.*"

"Section 11. If any provision contained in this amendatory act shall for any reason be held invalid, such decision shall not invalidate the remaining provisions of this act."

Before entering into a discussion of the issues involved, we should restate certain rules of law applicable to the problem facing this court. First, we should consider certain features of our state's organic law, and certain rules of construction governing interpretation of that organic law. Certain of the maxims hereinafter referred to are well-worn, some of them so oft-quoted as to appear trite. Nevertheless they are a fundamental part of our law and serve legitimate functions in aiding the court to arrive at the correct result.

Article III, section 1, of the Constitution of Montana, provides: "All political power is vested in and derived from the people; all government of right originates with the people; is founded upon their will only, and is instituted solely for the good of the whole."

Article III, section 2, provides that the power to alter and abolish their constitution resides in the people of this state.

Article III, section 29, states: "The provisions of this constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."

Article IV, section 1, provides for the separation of powers into three separate branches, the legislative, executive and judicial. In this regard see Mills v. Porter, 69 Mont. 325, 329, 222 Pac. 428, 35 A.L.R. 592; State ex rel. Schneider v. Cunningham, 39 Mont. 165, 168, 101 Pac. 962.

Article V, section 1, provides for the initiative and referendum.

The constitutionality of a legislative act is presumed, and this presumption must be overcome beyond a reasonable doubt before this court may overturn an expression of legislative will. As was said in State ex rel. Mills v. Dixon, 66 Mont. 76, 84, 213 Pac. 227, 229: "In approaching a discussion of the constitutionality of the act in question, we are governed by the axiomatic rule of constitutional law, oft repeated by this court, that the constitutionality of a legislative enactment is *prima facie* presumed, and every intendment in its favor will be made un-

less its unconstitutionality appears beyond a reasonable doubt. [Citing numerous cases.]''

Also to be kept in mind is this court's admonition in Arps v. State Highway Commission, 90 Mont. 152, 160, 300 Pac. 549, 553:

''As we have observed hitherto, the Constitution must receive a broad and liberal interpretation consistent with the purpose of the framers and the people in adopting it, that it may serve the needs of a growing state; 'the proper interpretation of any constitutional provision requires us to remember that it is a part of the organic law—organic not only in the sense that it is fundamental, but also in the sense that it is a living thing designed to meet the needs of a progressive society, amid all the detail changes to which a progressive society is subject.' State ex rel. Fenner v. Keating, 53, 371, 163 Pac. 1156, 1158.''

It has also frequently been stated that the Montana Constitution, unlike the Constitution of our United States, is a prohibition upon legislative power, rather than a grant of power. Hilger v. Moore, 56 Mont. 146, 167, 182 Pac. 477; State ex rel. Evans v. Stewart, 53 Mont. 18, 161 Pac. 309; Butte & Superior Mining Co. v. McIntyre, 71 Mont. 254, 229 Pac. 730; State ex rel. Bonner v. Dixon, 59 Mont. 58, 195 Pac. 841.

The rules governing the consideration of the validity or invalidity of legislative acts were clearly stated in State ex rel. Du Fresne v. Leslie, 100 Mont. 449, 454, 50 Pac. (2d) 959, 962, 101 A.L.R. 1329:

''In considering the validity or invalidity of legislative acts, we are governed by well-established rules. One is that every doubt must be resolved in favor of the validity of the legislative act. Hale v. County Treasurer, 82 Mont. 98, 265 Pac. 6; O'Connell v. State Board of Equalization, 95 Mont. 91, 25 Pac. (2d) 114, and cases cited. A second is that while legislative construction of a statute is entitled to consideration, it is not binding on the courts. State ex rel. Judith Basin County v. Poland, 61 Mont. 600, 203 Pac. 352; Wells Fargo & Co. v. Harrington, 54 Mont. 235, 169 Pac. 463; McClintock v. City of

Great Falls, 53 Mont. 221, 163 Pac. 99; Northern Pacific Ry. Co. v. Brogan, 52 Mont. 461, 158 Pac. 820. A third is that with reference to the subjects upon which the Constitution assumes to speak its declarations are conclusive upon the Legislature. State ex rel. Pierce v. Gowdy, 62 Mont. 119, 203 Pac. 1115. A fourth is that constitutional provisions are conclusive upon the Legislature and prevent the enactment of any law which extinguishes or limits the powers conferred by the Constitution. State ex rel. Bonner v. Dixon, 59 Mont. 58, 195 Pac. 841. A fifth is that the state government being divided into three separate and distinct branches, the officials of one branch may not usurp or exercise the powers of either of the others. Section 1, article 4, Constitution of Montana; State ex rel. Hillis v. Sullivan, 48 Mont. 320, 137 Pac. 392; Fulmer v. Board of Railway Commrs., 96 Mont. 22, 28 Pac. (2d) 849. A sixth is that the Constitution vests in the courts the exclusive power to construe and interpret legislative acts, as well as provisions of the Constitution. Section 3, article 8, Constitution. The soundness of these provisions of law and the rules enumerated will not, we think, be questioned.''

With these considerations in mind we enter upon a discussion of the issues presented in this case

The first question presented is whether the Legislative Assembly has the inherent power to amend an initiative of the people of Montana. The question was first answered in State ex rel. Goodman v. Stewart, 57 Mont. 144, 151, 187 Pac. 641, 652, in which the court held that laws proposed and enacted by the people under the initiative clause of the amendment are subject to the same constitutional limitations as are other statutes, and may be amended or repealed by the Legislature at will.

Mr. Justice Holloway dissented from a holding in the majority's decision, but concurred in the result that ''The legislature of this state possesses plenary law making power, except in so far as it is limited by the state Constitution and by the supreme law of the land * * *; and this rule was not af-

fected in the least by the adoption of the initiative and referendum amendment.''

In State ex rel. Bonner v. Dixon, 59 Mont. 58, 82, 195 Pac. 841, this court followed the holding in the Goodman case, supra, and stated that an initiative measure, insofar as it created a debt or liability within the provisions of section 2 of Article XIII, could be amended from time to time by the Legislature if the Legislature determined that the revenue to pay the principal and interest on the bonds proved insufficient to retire them.

The most recent pronouncement of the court on this subject may be found in Bottomly v. Ford, 117 Mont. 160, 169, 157 Pac. (2d) 108, 113, wherein it was said: ''It is, of course, well-established that initiative acts may be repealed; amended or changed by the legislative assembly.''

While it is well-settled that the Legislature has the power to amend, repeal, or change initiative measures, this power is plenary only insofar as the legislation proposed does not contravene an express limitation or prohibition of the Constitution of either Montana or the United States. See in this regard State ex. rel. Goodman v. Stewart, 57 Mont. 144, 151, 187 Pac. 641, supra. Therefore the amendment before this court, Chapter 44, must be tested in the light of the constitutional objections made. If there is no express constitutional prohibition, the law is valid, the amendment is valid.

We come now to the first contention made by the appellant, which is that Chapter 44 violates section 2, Article XIII, of the Montana Constitution, insofar as it creates a debt or liability in excess of $100,000, without submission of the question to a vote of the people.

Section 2 of Article XIII, in part, provides: ''\* \* \* \* but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the

people at a general election and shall have received a majority of the votes cast for and against it at such election."

As authority for his contention, appellant cites State ex rel. Diederichs v. State Highway Comm., 89 Mont. 205, 296 Pac. 1033. In that case the Legislature had passed a law, Chapter 1, Session Laws of 1931, authorizing the sale of State Highway Debentures in the sum of $6,000,000 to be retired out of a special highway fund composed of revenue from an excise tax upon the sale of gasoline. The law pledged that the Legislature would not reduce the gasoline excise tax until the bonds were redeemed. Diederichs, the appellant in the case, sought to enjoin the sale of the bonds on the grounds that they created a debt or liability within the constitutional debt limitation of section 2, Article XIII, supra, and therefore should have been submitted to the people for approval. In upholding the contention of Diederichs, the court held that the bonds created a "liability" under the provisions of section 2 of Article XIII, and 89 Mont. at page 211, 296 Pac. at page 1035, we find the following statement: "It certainly creates a liability, which includes a debt, for the state is expressly obligated not to reduce the excise taxes on motor fuels fixed by the Twenty-Second Legislative Assembly and to cause the tax to be collected and paid to the debenture holders. This is prohibited by the plain terms of the Constitution, unless approved by the people.

"The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance."

Mr. Justice Angstman specially concurred, stating that the contention that section 2 of Article XIII referred only to an *ad valorem* tax as distinguished from an excise tax was clearly without merit. Mr. Justice Matthews dissented on the ground the Legislature had created a special fund and therefore not a debt or liability of the state.

The holding in the Diederichs case has subsequently been approved in Graham v. State Board of Examiners, 116 Mont. 584, 594, 155 Pac. (2d) 956; State ex rel. State Aeronautics

Commission v. Board of Examiners, 121 Mont. 402, 429, 194 Pac. (2d) 633.

While the reasons given in the Diederichs case were sufficiently sound to warrant the court declaring the act unconstitutional in the light of the Constitution and the law appertaining at that time, assuming that Chapter 44 is sufficiently similar to Chapter 1, Laws of 1931, to warrant comparison, has there been any subsequent change in the Organic Law of Montana to persuade this court to overthrow the reasoning in the Diederichs case?

In 1932 the people of Montana amended section 2, Article IX, by inserting the following qualifications relevant to persons voting on debt or liability issues in an election:

"If the question submitted concerns the creation of any levy, debt or liability the person, in addition to possessing the qualifications above mentioned, must also be a taxpayer whose name appears upon the last preceding completed assessment roll, in order to entitle him to vote upon such question."

*It will be remembered the Diederichs case was decided in 1931.*

In Pioneer Motors, Inc., v. State Highway Comm., 118 Mont. 333, 338, 340, 165 Pac. (2d) 796, this court held that section 2, Article IX, in effect amended section 2, Article XIII, insofar as the latter provision stated that a debt or liability in excess of $100,000 should be submitted to "the people." "The people" were qualified by the amendment in 1932, and thereafter the court said any question submitted which creates a debt or liability would only of necessity have to be submitted to those appearing on the assessment rolls. The rule in the Pioneer case was subsequently followed in Thomas v. Board of Examiners, 122 Mont. 564, 569, 207 Pac. (2d) 553, and see Habel v. High School District "C" of Cascade County, 129 Mont. 588, 292 Pac. (2d) 349; Martin v. State Highway Commission, 107 Mont. 603, 615, 88 Pac. (2d) 41.

Who are the people appearing on the assessment rolls? Those who have been assessed a tax on their property, real or per-

16

sonal. See R.C.M. 1947, section 84-501; Habel v. High School District ''C'' of Cascade County, supra, 129 Mont. at page 592, 292 Pac. (2d) at page 351.

Now this court has held from an early date that taxes are levied and assessed, whereas licenses are imposed. State v. Camp Sing, 18 Mont. 128, 144, 44 Pac. 516, 32 L.R.A. 635, 56 Am. St. Rep. 551. In the Camp Sing case the court held that when the Constitution used the words ''levy,'' ''assess,'' and ''rate,'' it referred to taxes, whereas, when it used the word ''imposed'' it referred to licenses.

In Hilger v. Moore, 56 Mont. 146, 168, 182 Pac. 477, 481, Mr. Justice Holloway speaking for the court said: ''In the Camp Sing Case, the court reviewed at great length the several provisions of article 12, explained their purpose, and reached the conclusion, in effect, that all the restrictions imposed upon the Legislature by that article are restrictions with reference to property taxation. We are asked now to overrule these decisions, but in our judgment the correctness of each of them is beyond question.'' Approved in State v. Silver Bow Refining Co., 78 Mont. 1, 20, 252 Pac. 301.

In the instant case the tax is levied upon ''each package of cigarettes containing not more than twenty (20) cigarettes, and when a package shall contain more than twenty (20) cigarettes, then one cent (1c) for each twenty (20) or fraction of twenty (20) cigarettes in such package.'' Chapter 44, section 7. While the tax is levied on the cigarettes themselves and is collected at the time of sale, nevertheless there is no formal assessment made within the purview of the Camp Sing case, supra. The people who pay the tax do not appear on the assessment rolls—the guide to determine those who vote on a ''debt or liability.''

Was this the intent of the people when they enacted the amendment to section 2, Article IX?

Such a conclusion would effectually take away the voting franchise from those people who actually paid the tax. Such a result is at once manifestly unjust and unfair. Although it

will be observed that in the Pioneer Motors case, supra, the court had before it a license tax, factors here considered were never brought to the attention of the court at that time. Therefore, it must be presumed that the decision was not made in the light of these observations.

In the instant case we are confronted with a debt retired from a special cigarette excise tax fund. The tax is collected from the purchaser before sale and delivery to the taxpayer. Chapter 44, section 7; R.C.M. 1947, section 84-5606, subd. 1. Thus the situation exists where many persons appearing on the assessment rolls may be nonsmokers, while many persons not appearing on the rolls are smokers. While we do not deny that this result could perhaps legally follow, it is so apparently unjust and manifestly unfair that we do not think such a result was intended.

"A constitution, or provisions thereof, should receive a reasonable and practical interpretation in accord with common sense." 16 C.J.S. Constitutional Law, section 14, pages 66, 69; See also United States v. Wainer, D. C. Pa., 49 F. (2d) 789; State ex rel. Jones v. Lockhart, 76 Ariz. 390, 265 Pac. (2d) 447; McMillan v. Siemon, 36 Cal. App. (2d) 721, 98 Pac. (2d) 790; Higer v. Hansen, 67 Idaho 45, 170 Pac. (2d) 411.

All of the provisions of the Constitution bearing upon the same subject matter are to receive appropriate attention and be construed together. Hilger v. Moore, supra, 56 Mont. 146, 182 Pac. 477; Martien v. Porter, 68 Mont. 450, 219 Pac. 817; State ex rel. Corry v. Cooney, 70 Mont. 355, 225 Pac. 1007; State ex rel. Hinz v. Moody, 71 Mont. 473, 230 Pac. 575; State ex rel. Palagi v. Regan, 113 Mont. 343, 126 Pac. (2d) 818.

The construction which appeals to an innate sense of justice and fairness is that section 2 of Article IX, in adding the property holding qualification to voting on debts or liabilities, confined the additional qualification to only those debts or liabilities which look to *ad valorem* taxes for their retirement. In this way we avoid an unreasonable construction and

arrive at a just, and we believe, correct interpretation of that section. It logically follows that section 2 of Article XIII, insofar as there is a "debt" or "liability" limitation imposed, refers to only those debts or liabilities which look to the property or *ad valorem* taxes for their retirement, and that *only* those debts or liabilities must first be presented to the "people," now restricted to taxpayers.

In effect, section 2, Article IX, amended the words "debt or liability" as they appear in section 2, Article XIII, and has effectively confined them to debts or liabilities which must be retired out of ad valorem taxes. In this manner we avoid a conflict and unreasonableness.

Looking now to the instant case, we find that the bonds, assuming they create a "debt or liability," do not create the type of "debt or liability" which section 2, Article XIII, proscribes, since in this case retirement of the bonds looks to the levy of an excise tax without the taxpayer being enrolled on the assessment rolls.

It is apparent that the court in the Diederichs case was not confronted with the logic as developed in this opinion for the very reason that the amendment to section 2 of Article IX was not enacted until 1932, after the court had decided the Diederichs case. Had the amendment been enforceable at that time we do not think the court would have arrived at the conclusion it did. That the conclusion reached by this court lends itself to judicial approval is amply verified in State ex rel. Capitol Addition Bldg. Commission v. Connelly, 39 N. M. 312, 46 Pac. (2d) 1097, 100 A.L.R. 878, approved in Stone v. City of Hobbs, 54 N. M. 237, 241, 220 Pac. (2d) 704 (unanimous opinion); and see Banner v. City of Laramie, 74 Wyo. 429, 289 Pac. (2d) 922.

In the first above-cited case the Legislature had provided for the issuance of bonds and debentures in excess of the constitutional debt limitation, payable out of a special fund created from a fee imposed upon the filing of every civil action in the office of the clerks of the various district courts. The state

pledged the fees so collected to the fund until the bonds were completely retired. The court held that the fee was "in the nature of an excise" tax. [39 N. M. 312, 46 Pac. (2d) 1103.] Contention was made that the act created a debt or obligation of the state in contravention of express constitutional provision.

The constitutional provision in question (Constitution of New Mexico, Article 9, section 8) provided that no debt should be contracted on the part of the state in excess of $200,000 without submission of the question to a vote of the qualified voters of the state. Although the constitutional limitation referred to "debt" as distinguished from "debt or liability" found in our Constitution, this distinction is not important since the sole question to be determined is the *type* of debt or liability proscribed. Thus, whether the limitation be confined to "debt" or be broadened to "debt or liability" is not material.

In holding the act did not contravene the constitutional provision the court, in the Capitol Addition Bldg. Commission case, reviewed the debt limitation provisions of their Constitution, and 39 N. M. on pages 319-320-321-322, 46 Pac. (2d) on page 1101, said: "Significantly, by Constitutional Amendment No. 2, submitted as Senate Joint Resolution No. 7 by the Eleventh Regular Session in 1933 (Laws 1933, page 538), and subsequently adopted, ownership of real estate in the district was added as a qualification to the right to vote upon the question of creating the debt proposed. * * *

"Certainly, when the Constitution framers in section 8 limited the amount of any such debt as they had in mind to 1 per centum of the assessed valuation of all property subject to taxation in the state, 'as shown by the preceding general assessment,' or when in sections 10 and 12 they enjoined payment of a property tax during the preceding year as a condition of the right to vote, they must have conceived that said assessment bore some relationship to the debt. Could the thought have been other than this, that such assessment roll and the property there listed would be resorted to from year to year

by the general taxing power as the source of funds for repayment of the debt so created? We think not, but, if so, no explanation so naturally arises as the one suggested. * * *

"Now, either the debentures here assailed are to be condemned because not repayable from the proceeds of a property tax levy, or they are not within the interdiction of article 9, section 8, because not the kind of debt therein contemplated. One or the other conclusion seems inescapable. The framers of the Constitution were not unacquainted with the excise taxation as a source of revenue, as witness the language of article 8, section 2, as originally adopted. They thus either purposely denied to the state, through its Legislature, the power to employ same as a basis of credit to any extent whatsoever, and deliberately imposed the whole burden of repaying such indebtedness as lawfully might be created upon property taxpayers; or they left the Legislature in possession of its plenary powers touching the subject.

"It is not unusual to find words employed in a Constitution in a less comprehensive sense than they are capable of bearing. 'Taxes' is surely a term broad enough to cover excise as well as property taxes. And yet we have held in accordance with the courts of other states that the word 'taxes,' as used in the constitutional guaranty of equality and uniformity, does not apply to excise taxes. State ex rel. Taylor v. Mirabal, 33 N. M. 553, 273 Pac. 928, 62 A.L.R. 296. Construing together these companion sections of article 9, in order to arrive at the true meaning and intent of the framers of the Constitution [Citing cases.], we hold the debt contemplated in section 8 thereof is one secured by a property tax, and not an excise tax. * * *

"Counsel for respondent argue that the 1921 amendment of section 16 of article 9, involved in State v. Graham [32 N. M. 485, 259 Pac. 623], constitutes a legislative interpretation, entitled to weight, that a constitutional amendment was necessary to authorize the debentures there assailed. Even so, such interpretation should have controlling persuasiveness only in the case of doubtful meaning or construction, a condition not

here present. The submission by the Eleventh Regular Session of the Amendment to section 11 of article 9, adding the ownership of real estate within a school district as a condition to the right to vote upon the proposed creation of a debt by such district, might be argued with almost the same force as reflecting the view of that Legislature that the debt so to be created was to be repayable by a property tax affecting the owners of real estate.''

The above language utilized in the Capitol Addition Bldg. Commission case amply illustrates the proposition promulgated by this court.

Many courts have reached the conclusion arrived at by this court without the benefit of property holding qualifications as a prerequisite to voting on the debt. In this regard see Gruen v. State Tax Commission, 35 Wash. (2d) 1, 211 Pac. (2d) 651-679; State ex rel. Roddey v. Byrnes, 219 S. C. 485, 66 S. E. (2d) 33; State ex rel. Fatzer v. Board of Regents, 167 Kan. 587, 207 Pac. (2d) 373; State ex rel. Boynton v. Kansas State Highway Commission, 138 Kan. 913, 917-918, 28 Pac. (2d) 770; 49 Am. Jur., States, Territories, and Dependencies, section 67, page 280; Annotation 100 A.L.R. 900, holding that the debt limitation refers to those debts which look to *ad valorem* taxes for their extinction, rather than license or excise taxes. There are also many cases and jurisdictions which have expressly refused to apply the holdings of the above cases to their constitutional debt provisions. In this regard see State ex rel. Kemp v. Board of Liquidation of State Dept., 214 La. 890, 39 So. (2d) 333, 336; Taxpayers and Citizens of Town of Georgiana v. Town of Georgiana, 265 Ala. 654, 93 So. (2d) 493; Lyons v. Bottolfsen, 61 Idaho 281, 101 Pac. (2d) 1; People ex rel. City of Chicago v. Barrett, 373 Ill. 393, 26 N. E. (2d) 478; Boswell v. State, 181 Okl. 435, 74 Pac. (2d) 940; Hamilton's Appeal, 340 Pa. 17, 16 A. (2d) 32, 36; Boe v. Foss, S. D. 1956, 77 N. W. (2d) 1, 9. However, it should be noted that none of the above jurisdictions have property assessment as a prerequisite to voting on the debt or liability to be created,

and therefore the reasoning in those cases does not apply here. In addition the Illinois provision for a debt limitation clearly was intended to include the possibility of debts payable from excise taxes (Illinois Constitution, Article 4, section 18, S.H.A.), for it includes debts payable from a tax levy (property tax) and those payable from "other sources of revenue." See People ex rel. City of Chicago v. Barrett, supra. The court in Boswell v. State, supra, also emphasized the fact that their constitutional debt limitation referred to "revenues" thus, by implication including all sources of revenue. See Boe v. Foss, supra.

For the reason that the constitutional provisions of the states holding contrary to the New Mexico rule are materially different, we are constrained to follow the precedent and the reasoning in the Capitol Addition Bldg. Commission case, supra.

Appellant's second argument against the validity of Chapter 44 is that it has not been presented to the qualified electorate as demanded by section 2, Article IX.

It will be noted that section 2 of Article IX does not *require* that a question of a debt or liability be submitted to the people, but rather, *if* a question involving a debt or liability is *presented* to the people then it must be submitted to only the qualified electorate, those appearing on the assessment rolls. Pioneer Motors, Inc., v. State Highway Commission, supra, 118 Mont. 333, 165 Pac. (2d) 796; Thomas v. Board of Examiners, supra, 122 Mont. 564, 207 Pac. (2d) 553. Therefore the first question to determine is whether the question must be submitted to the people under the particular constitutional provision in question. In the instant case, the propriety of the legislation without submission to the people is tested by section 2, Artivle XIII. The answer to the question has been given in the foregoing part of this opinion and needs no further discussion. Since we have held that Chapter 44 was not a debt or liability proscribed by section 2, Article XIII, this contention is without merit.

The third constitutional objection raised by appellants is

 that Chapter 44 deprives persons of their property without due process of law within the meaning of state and federal constitutional provisions.

The same argument raised by the appellant was also raised with regard to Initiative 54, and with regard thereto this court said: "This contention is wholly without merit. The practice of levying an excise tax upon tobacco is so well established that it is no longer open to question." State ex rel. Graham v. Board of Examiners, supra, 125 Mont. 419, 433, 239 Pac. (2d) 283, 291.

The arguments made by the appellant with regard to the "due process" issue are eloquent but futile.

An attempt to discuss each of the arguments made would lend nothing to this opinion because the questions raised have been settled with finality in this and other jurisdictions.

The fourth argument made is that Chapter 44 impairs the contractual obligation of the State of Montana to holders of bonds issued under Initiative 54 in violation of section 11, Article III, of the Montana Constitution.

The basis of this argument is twofold: (1) That the increased cigarette tax enacted to fund the bonds issued under Chapter 44, resulting in a price increased on cigarettes, will result in less cigarettes being sold, therefore "drying up" the source of revenue originally provided for the payment of the bonds issued under Initiative 54; (2) That the bonds issued under Chapter 44 provide for interest on the loan in the amount of $4\frac{1}{2}$ percent whereas, the interest provided for by Initiative 54 was only 4 per cent, thus making the latter bonds less desirable, which tends to depress the market for them and thereby reduce their cash or pledge value.

Both of the contentions made are purely speculative in nature, and appellant has not pointed out the particulars in which the obligations created by Initiative 54 are impaired, if impaired.

A contract is analyzable into two elements: the *agreement,* which comes from the parties, and the *obligation* which comes

from the law and makes the agreement binding on the parties. When are the obligations of a contract impaired? Chief Justice Hughes, in Home Building & Loan Ass'n., v. Blaisdell, 290 U.S. 398, 431, 54 S. Ct. 231, 237, 78 L. Ed. 413, 88 A.L.R. 1481, states:

"The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them * * * and impairment * * * has been predicated of laws which without destroying contracts derogate from substantial contractual rights."

Mr. Justice Black, commenting on the Blaisdell decision said:

"The Blaisdell decision represented a realistic appreciation of the fact that ours is an evolving society and that the general words of the contract clause were not intended to reduce the legislative branch of government to helpless impotency." Wood v. Lovett, 313 U.S. 362, 383, 61 S. Ct. 983, 993, 85 L. Ed. 1404.

In the instant case the obligation imposed by Initiative 54 obliged the State of Montana to continue the tax on cigarettes in the amount provided, and to deposit the revenue from this tax in a special fund to retire the bonds. Did Chapter 44 alter these obligations? Obviously not; the obligation remains in force and effect in exactly the manner in which it was enacted. The fact that some portion of the revenue of the state is tied up in retiring bonds does not prevent the state government from seeking new revenue from the same source upon which the former tax was imposed. If such were the result, it would reduce the taxing power of the state to "helpless impotency."

The same logic can be applied to the interest rate. As was so aptly stated by the respondent: "If there were any materiality to such an allegation the State could never increase the rate of interest on its obligations above the lowest existing rate on any of its outstanding obligations." The fact that the bonds issued are for the same subject matter and are funded by the

same tax source does not alter the fact that one in legal effect does not affect the other.

Nor has the agreement been impaired. No substantial rights of the bondholders have been derogated by Chapter 44. Under Initiative 54 there was no agreement by the State to maintain the entire cigarette tax at its then level, nor did it obligate itself to issue bonds on any subsequent date at a mere 4 percent interest rate. If these were not part of the agreement how could they be impaired? Obviously, they could not. For these reasons we find that the fourth contention is without merit.

The last contentions of appellant have hereinbefore been set out and deal with certain ambiguities which exist in the act. Of course the conflict between sections 6 and 7 of Chapter 44, relating to the payment of administrative expenses is patent, however, this court is pledged to reconcile conflicting statutory provisions and make them operative in accordance with the legislative intent, insofar as it is possible to do so. In re Naegele, 70 Mont. 129, 224 Pac. 269; Fletcher v. Paige, 124 Mont. 114, 220 Pac. (2d) 484, 19 A.L.R. (2d) 1108.

In Initiative 54 the law provided that the money raised from sale of the bonds would be used ''For the purpose of providing for the payment of the honorarium, or adjusted compensation, herein provided for and *for paying the expenses of administration of this law * * *''*. Emphasis supplied. Section 12, Initiative 54.

Section 5 of Chapter 44 retained this provision of the original Initiative 54. Section 6 of Chapter 44 also directs that administrative expenses shall be paid from the proceeds of the sale of the bonds.

From the foregoing portions of the act it is self-evident that the Legislature, in amending Initiative 54, intended to provide for payment of the administration of the act from the proceeds of the sale. However, in amending section 84-5621 by section 7 of Chapter 44, the Legislature provided:

''All taxes levied, imposed and assessed under the provisions

of Subdivision (3) of said Section 84-5606 shall, when collected, be paid to the state treasurer and credited to a special fund to be known as the War Veterans' Compensation Bond Retirement Fund No. 2, which fund shall be kept segregated from all other money in the state treasury and shall, while any of the bonds hereafter issued and sold, in addition to the twenty-two million dollars ($22,000,000.00) authorized by said Initiative Measure No. 54, as originally enacted, or any of the interest upon such additional bonds, remain unpaid, be used only for the payment thereof, *and of the expenses of administration of this act.*" (Emphasis supplied.)

It is obvious this latter-quoted provision was a mere oversight on the part of the Legislature, and that their governing intent, as gleaned from the foregoing parts of the act is that the administrative costs should be paid from the fund created by the proceeds of the sale of the bonds. Given this interpretation there is no conflict or ambiguity. Under the severability clause of the act (section 11, Chapter 44), this court is authorized to strike "and of the expenses of administration" to avoid illegality.

Appellant maintains that section 7 of Chapter 44, insofar as it attempts to appropriate proceeds of the cigarette license tax for a period of more than two years, is unconstitutional as conflicting with section 12 of Article XII of the Montana Constitution which provides in part: "No appropriation of public moneys shall be made for a longer term than two years", and with section 34, Article V, which provides in part: "No money shall be paid out of the treasury except upon appropriations made by law * * * ".

Appellant admits that under section 6, Chapter 44, there would be no violation of section 34, Article V, or section 12, Article XII. With this we agree. See State ex rel. Graham v. Board of Examiners, supra, 125 Mont. 419, 435, 436, 239 Pac. (2d) 283, and cases cited therein; State ex rel. Normile v. Cooney, 100 Mont. 391, 409, 47 Pac. (2d) 637; State

ex rel. Blume v. State Board of Education, 97 Mont. 371, 380, 34 Pac. (2d) 515.

Since we have held that section 6, Chapter 44, reveals the governing intent of the Legislature, then that portion of section 7, Chapter 44, and section 84-5621, R.C.M. 1947, seemingly to the contrary should be read so as to express that intention.

Putting the construction upon the act heretofore set out clearly avoids the consequences which follow from attempting to make an appropriation from the "General Fund" for more than two years. The fund created is a "special fund" and neither section 34 of Article V, nor section 12 of Article XII, have any application. We believe this is the correct construction of Chapter 44—a construction which will not emasculate the intent of the Legislature, but effectuate it.

For the reasons set out in this opinion the judgment of the trial court is affirmed.

MR. JUSTICES CASTLES and ANGSTMAN, and THE HONORABLE W. M. BLACK, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, concur.

MR. JUSTICE ADAIR (dissenting).

In State ex rel Graham v. Board of Examiners, 125 Mont. 419, 239 Pac. (2d) 283, this court held that an act authorizing a veterans' honorarium and the issuance of bonds for that purpose payable from a cigarette tax serves a public purpose and is valid as an attempt to partially compensate veterans for their sacrifices. The particular veterans compensated by the measure there considered were those who had served the United States of America and the State of Montana by their participation in that conflict known as World War II. Subsequent to the cessation of hostilities in World War II, the United States became involved in another overseas conflict, and once again the State of Montana has furnished participants for that conflict who served therein and who have made sacrifices for which they should be compensated.

In the Graham case, supra, the legislation authorizing the honorarium was an initiative, Initiative Measure No. 54, Laws of 1951, directly submitted to, voted and passed by the people of the entire state. The measure so passed by the direct vote of the people which authorized the honorarium for the veterans of World War II did not cover the veterans of the more recent Korean conflict.

In an endeavor to amend Initiative Measure No. 54, Laws of 1951, page 781, so as to provide compensation for the veterans of the Korean conflict, the Thirty-fifth State Legislative Assembly, in 1957, sought to amend Initiative Measure No. 54, supra, by introducing in the Legislature and passing a bill which became Chapter 44 of the Montana Session Laws of 1957. By such amendment the Legislature seeks to provide for the payment of an honorarium to the veterans of the Korean conflict on substantially the same basis as that paid to the veterans of World War II through the enactment of Initiative Measure No. 54, supra, and by such amendment to provide for the issuance and sale of additional bonds in the amount of $6,000,000 over and above the amount of $22,000,000 originally provided for in Initiative Measure No. 54 and to further provide for the levy of an additional one cent tax on cigarettes over and above the two cent tax on cigarettes originally provided for in Initiative Measure No. 54.

By virtue of the authority purporting to have been granted by the Thirty-fifth Legislative Assembly in its enactment of Chapter 44, Laws of 1957, the state board of examiners commenced proceedings to carry said Chapter 44 into effect, whereupon, by complaint filed in the district court for Lewis and Clark County, the plaintiff, James E. Cottingham, here sought to enjoin the board of examiners from so proceeding.

The district court made an order refusing to issue an injunction and this is an appeal by plaintiff from that order.

On appeal the appellant Cottingham assigned some six specifications of error. In my opinion the correct determination of but one of such specifications would be decisive of the appeal.

As before stated, Chapter 44, Laws of 1957, seeks only to amend Initiative Measure No. 54. Chapter 44, supra, provides for an honorarium for a larger number and different class of veterans. It levies an additional tax and it authorizes an increase of liability in the further and additional amount of $6,000,000. It makes no provision whatever for the submission of the measure to the vote of the people for their acceptance or rejection. Its passage by the Legislature and signing by the governor was deemed final.

It is the appellant's contention that the omission to provide for the submission of the law (Chapter 44, Laws of 1957), to the vote of the people invalidates the act for the reason that the act creates a debt or liability in excess of $100,000 without the issue being submitted to the people as required by section 2, Article XIII, of the Montana Constitution, which provides:

"The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the *levy of a tax* sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; *but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,-000)* except in case of war, to repel invasion or suppress insurrection, *unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election.*" (Emphasis supplied.)

The specific question here presented is: In view of the above provision in our State Constitution may the State Legislative Assembly lawfully amend Initiative Measure No. 54, Laws of 1951, page 781, wherein the amount of the debt or liability as voted upon and passed by the people is raised some $6,000,000

without first submitting such amendment and six million dollar raise to a vote of the people?

The question presented is not new. In 1931, the State Highway Treasury Anticipation Act was passed. The Act provided for an excise tax on motor fuel to be used to pay the principal and interest on state highway debentures authorized to be sold in the amount of $6,000,000. After passage of the Act by the Legislative Assembly and the signing thereof by the governor on January 26, 1931, a significant date, one Diederichs brought a proceeding to enjoin the issuance or selling of the debentures. The action was submitted to this court on February 9, 1931, and the opinion herein was rendered February 21, 1931. State ex rel. Diederichs v. State Highway Commission, 89 Mont. 205, 296 Pac. 1033.

The principal contention in the Diederichs case, supra, was that the Act of the Legislature, there in question, violated the Constitution of the State of Montana by creating a debt or liability in excess of $100,000 without submitting the measure to a vote of the people as is required by the provisions of section 2, Article XIII, of our State Constitution. There, as here, the court was required to take full cognizance of the rules of law applicable when a question of the constitutionality of a legislative act is raised. The primary argument there presented was that a debt or liability was not created within the constitutional bar because a special fund to repay the indebtedness had been created. There this court rejected such contention and held the law void as violative of the Constitution because it was not submitted to the people. By reason of the decision in the Diederichs case, I believe it necessary to set out the court's holding discussing the application of section 2, Article XIII, wherein this court said:

"* * * Knowing the tendency of governments to run in debt, to incur liabilities, and thereby to affect the faith and credit of the state in matters of finance, thus imposing additional burdens upon the taxpaying public, the framers of the Constitution placed positive limitations upon the power of the

Legislative Assembly to incur a debt or impose a liability upon the state beyond the limit prescribed, without referring the proposition to the electorate for its approval. * * *

"The creation of an obligation, payable from these funds, is a liability of the state; its effect is to divert a large part of the revenues of the state into the state highway fund for a period of ten years, which otherwise might be used to pay the public debt or to defray the general expenses of the government, thus relieving the heavy burden of taxes levied upon property. If the process designed by chapter 1 does not create a state liability, then the Legislature undoubtedly could do the same thing with other license taxes, the inheritance taxes, and the net proceeds of mines taxes, all of which are properly considered in determining the limitation of expenditures and appropriations under section 12 of article 12 of our Constitution (State ex rel. Toomey v. State Board of Examiners, supra [74 Mont. 1, 238 Pac. 316], and thus accomplish by indirection what the Constitution prohibits to be done directly.

"The people are gravely concerned as to how and the purposes for which their money is spent. They may eagerly desire to sell the proposed debentures, thereby matching the sums provided by a generous Congress, to the end that our state may be afforded good roads without delay; but another measure pledging excise taxes in large amounts for some special purpose might encounter their definite disapproval.

"The examples demonstrate, if any demonstration is needed, the salutary purpose of the constitutional provision here under consideration. * * *

"The upshot is that in order to validate the act it must receive the approval of the electorate."

Justice Angstman in his specially concurring opinion said:

"The reasons stated in the court's opinion supporting the conclusion that the creation of the special fund for the payment of the debentures does not prevent the act from creating a liability are my reasons why the provision for a special fund does not save the act from creating a debt. The scheme provided

by chapter 1 diverts public revenues to the payment of a loan by the state as effectually as if the full faith and credit of the state were actually pledged in payment of the debentures. The fact that it creates a debt within the purview of section 2, article 13, is the justification for attempting to make the law imposing the excise tax irrepealable. Much was said by learned counsel for respondents in the brief and oral arguments to the effect that section 2, Article 13, in the use of the words 'levy a tax,' means only an *ad valorem* tax. If this were so, then this act is in conflict with section 2, and a vote of the people would. be useless. If that is the correct interpretation to be placed upon section 2, then that section, by construction, would contain this command to the Legislature: 'You shall not create a debt in any manner unless you provide for the levy of an *ad valorem* tax sufficient to pay the principal and interest within the time provided.' Confessedly no *ad valorem tax* has been levied. That construction of section 2 would make it read substantially as the Iowa Constitution * * * which requires 'the collection of a direct annual tax.' Under such a provision the Iowa Supreme Court has held that the Legislature was without authority to exercise a mortgaging power over future gasoline and motor vehicle license taxes. State ex rel. Fletcher v. Executive Council, 207 Iowa 923, 223 N.W. 737.

''In my opinion, however, the words 'levy of a tax,' as used in section 2 contemplate only that the Legislature when creating a debt shall provide for raising sufficient revenues to pay the principal and interest by either of the constitutional methods of raising revenues for public purposes, and that it *includes the levy or imposition of a license or excise tax, as here.''* (Emphasis supplied.)

Thus on February 21, 1931, the law of the State of Montana required that the creation of a debt or liability in excess of $100,000 depended for its validity upon the outcome of the vote of the people. Has this law been changed? May the Legislature today without a vote of the people amend a $22,000,000 bond issue of which the people approved so that it is increased

to and becomes a $28,000,000 bond issue? Section 2 of Article XIII, today reads precisely as it read in 1931. This section of our Constitution has not been changed or amended. It follows that the amendatory act, Chapter 44, Laws of 1957, attempting to create a liability of the state in excess of $100,000 without submitting the question to the people, presents the identical question long since decided by this court in the Diederichs case, supra.

In the instant case it is urged that the Diederichs case no longer controls in a situation such as is here presented because in 1932 the Constitution was amended by inserting a new provision in section 2 of Article IX of the Constitution which provides: ''If the· question submitted concerns the creation of any levy, debt or liability the person, in addition to possessing the qualifications above mentioned, must also be a taxpayer whose name appears upon the last preceding completed assessment roll, in order to entitle him to vote upon such question.''

While the above change clarified and defined the qualifications of the persons entitled to vote on a question which concerns the creation of any levy, debt or liability, yet it did not amend or change the meaning of the words ''debt or liability'' as used in section 2 of Article IX of the Constitution so as to make the section read ''debt or liability founded on an ad valorem tax'' as is stated in the majority opinion herein.

The Diederichs case, supra, held that the word ''tax'' as used in section 2, Article XIII, was any tax provided for by the Constitution, either a license or excise tax or a property tax. The tax involved in the instant case is an excise tax. It is not a license.

In State ex rel. State Aeronautics Commission v. Board of Examiners, 121 Mont. 402, 194 Pac. (2d) 633, 636, this court quoted with approval from State ex rel. Attorney General v. Wisconsin Constructors, 222 Wis. 279, 268 N.W. 238, 243, as follows:

'' 'Taxes are imposed for the purpose of general revenue. Licenses and other fees are ordinarily imposed to cover the cost

of supervision or regulating. [Citing cases.] The distinction between a tax and an imposition under the police powers is well stated in Cooley on Taxation (4th Ed.), pages 3511, 3513, 3528:

" ' "The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, though the purpose is essentially different. The one is made for regulation and the other for revenue. If the purpose is regulation the imposition ordinarily is an exercise of the police power, while if the purpose is revenue the imposition is an exercise of the taxing power and is a tax. If, therefore, the purpose is evident in any particular instance, there can be no difficulty in classifying the case and referring it to the proper power. * * *" ' "

The tax here imposed has nothing whatever to do with the regulation of any thing or person. Its purpose is simply and solely to raise revenue. It is an excise tax on cigarettes. It is a tax on *property*. Although the word "imposed" is used alone in section 16 of Initiative Measure No. 54, Laws of 1951 at pages 787-789, the actual imposition is in subdivision 3 of section 84-5606, R.C.M. 1947, as amended, the pertinent part whereof provides:

"Subdivision—(3). From and after the effective date of this amendatory act of the Thirty-fifth Legislative Assembly of the State of Montana, there is hereby levied, imposed and assessed, and there shall be collected and paid to the State of Montana, upon cigarettes sold or possessed in this state, the following *excise* tax * * *." (Emphasis supplied.)

The tax imposed is an excise tax on property. It is not a license tax. This law looks to the levy and assessment of a tax on property for its retirement. The names of persons on the assessment rolls are persons paying either personal property taxes or real property taxes, or both. Why then should these taxpayers be denied the right given to them by the State Constitution to pass upon the creation of any debt or liability,

"which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000)" when such debt and liability is to be retired by an additional tax on property.

The majority opinion herein also poses the proposition that from the amendment to section 2 of Article IX of the Constitution was also changed and amended by limiting an elector to a taxpayer "whose name appears upon the last preceding completed assessment roll," and that section 2 of Article XIII of the Constitution was further amended by providing that the debts or liabilities to be voted upon must be debts or liabilities which look to ad valorem taxes for their retirement.

I am unable to subscribe to the theory thus advanced. The majority opinion therein implies that the constitutional amendment of 1932 was enacted to overcome this court's holding in the Diederichs case, supra. Such was neither the purpose nor intent of the amendment. The intent of an amendment to the Constitution like the intent of an act of the Legislature must be determined as of the date or time of its *introduction*. The constitutional amendment to section 2 of Article IX was introduced in the house on January 13, 1931, whereas, the Diederichs case was not submitted to the supreme court until February 9, 1931, and it was there decided on February 21, 1931. Now the act of the Legislature in question in the Diederichs case was not passed until January 26, 1931, hence it becomes most difficult to believe that the amendment to section 2 of Article IX of the Constitution was proposed January 13, 1931, with the thought in mind that *if* the particular act should be *passed,* and *if* the supreme court should thereafter hold the act *void,* then, and in that event, there would be the constitutional amendment, which, in the future, would cure such defect as the supreme court *might* find in the act at some future time when the Diederichs case should be submitted to this court for decision.

The effect on section 2 of Article XIII of the above amendment to the Constitution has been considered in later cases con-

cerning this same question here urged. See Martin v. State Highway Commission, 107 Mont. 603, 615, 88 Pac. (2d) 41, and Pioneer Motors, Inc., v. State Highway Commission, 118 Mont. 333, 165 Pac. (2d) 796. In upholding the validity of the elections the court implied their necessity even in view of the amendment, and this court should not be expected to pass upon the validity of an election if such election should be deemed to be wholly unnecessary.

Likewise I am unable to subscribe to the proposition that the provisions of the Constitution here involved must be interpreted in the light of what is "fair." There are many provisions in the Constitution whose "fairness" would be violently contested by some and upheld by others depending on their respective and varying interests and points of view. The constitutional provision here in question is mandatory and the question of its fairness or unfairness is not before this court for either consideration or determination.

This court's plain duty is to see that the constitutional mandate has been obeyed by the Legislature. The state revenues must be obtained principally by taxes such as specific property taxes, ad valorem property taxes or excise or license taxes. Property presently bears the greatest weight of these taxes. It is the most unavoidable of all the taxes. Bearing this in mind the framers of our Constitution and the people of the State of Montana have put a brake upon the legislative power to create debts and liabilities and pledge taxes for their retirement, because if the money be segregated into funds such as are here provided then the burden of the general revenue is imposed upon the other tax sources and finally, if carried to the extreme here sanctioned, then the time may come when we reach that stage where we end with ad valorem property taxes being the only source of revenue for the general fund of the state. Surely, persons owning property subject to ad valorem taxation have as keen interest in the functions of government as have nontaxpayers. Certainly, they have more at stake than nontaxpayers. The incurrence of any state obligation, irrespective of how it is to be

financed, vitally concerns such taxpayers whose roots are finally planted in this state through their property ownership. These responsible taxpaying citizens of this state should have the opportunity to exercise the right given to them by the Constitution to vote and pass upon these measures creating debts and liabilities far in excess of the one hundred thousand dollar limit set by the Constitution.

The mischief inherent in the majority opinion is that it leaves the ad valorem taxpayer defenseless to exercise control over the creation of debt and liabilities, yet places the principal burden of such debts and liabilities upon him.

There is yet another question left unanswered by the majority opinion herein. It is quite clear that the 1932 amendment to the Constitution was never designed nor proposed with the purpose or thought in mind of abrogating the result of the Diederich case, supra. The purpose in view was to narrow the class of voters on debt or liability questions to those voters primarily and naturally interested in such questions. The holding in the Diederichs case was against the argument and contention that the words "levy a tax" meant an ad valorem tax. In my opinion the act of the Legislature here under consideration is governed and controlled by this court's rulings in the Diederichs case. As said in the Diederichs case, supra, 89 Mont. 205, 210, 296 Pac. 1033, 1034:

"Nor is it any concern of the court whether the act is expedient, wise, or unwise. State ex rel. Bonner v. Dixon, 59 Mont. 58, 195 Pac. 841. It is legislative power, not policy, that is drawn in question. And while we are mindful of the presumptions in favor of legislative acts, yet, being bound to support, protect, and defend the Constitution, when an enactment transgresses the constitutional limitations beyond a reasonable doubt, it is our solemn and sworn duty to so declare it. We are mindful, too, that the declaration of Constitutions are placed therein to be obeyed, and are not to be frittered away by construction. Less v. City of Butte, 28 Mont. 27, 72 Pac. 140, 61 L.R.A. 601, 98 Am. St. Rep. 545. Our duty in this respect remains the

same no matter how urgent may be the desire to obtain money with which to carry on the much-needed program of highway construction. As stated by that able jurist, Chief Justice Taney of the United States Supreme Court, in the famous Dred Scott decision (Scott v. Sandford, 19 How. 393, 15 L. Ed. [691] 692): 'No change in public opinion on questions of public policy can ever be given any weight in construing the provisions of a Constitution where the meaning is clear, for the adoption of a Constitution that might be deemed wise at one time and unwise at another would abrogate the judicial character of the court and make it the reflex of the popular opinion or passion of the day.' If the act in question authorizes the creation of a debt or liability in excess of $100,000 there are two available methods of accomplishing what the act proposes: one is to amend the Constitution, and the other is to obtain the consent of the people at an election for that purpose.''

In my opinion the act of the Legislature here under consideration is governed and controlled by this court's decision in the Diederichs case. I am therefore unable to agree with the interpretation and construction accorded the above mandatory and prohibitory provision of the Constitution by the majority opinion herein. I would hold that this court's opinion in the Diederichs case is determinative of this appeal that the act in question is violative of the Constitution in that it wholly fails to provide for the submission to the vote of the people on the question of the creation of the debt and liability as is plainly provided for in and required by the provisions of section 2 of Article XIII of the Constitution of Montana.

In view of the foregoing I am unable to agree with the majority opinion herein.